[No. B083893. Second Dist., Div. Five. Feb. 15, 1995.]

DARYL F. GATES et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
TAKEO HIRATA et al., Real Parties in Interest.

## COUNSEL

James K. Hahn, City Attorney, Thomas C. Hokinson and Annette Keller, Assistant City Attorneys, for Petitioners.

No appearance for Respondent.

Johnnie L. Cochran, Jr., Eric G. Ferrer, Esner, Marylander, Zakheim & Higa, Billie Ann U. Higa and Stuart B. Esner for Real Parties in Interest.

## OPINION

## TURNER, P. J.—

### I. INTRODUCTION

Defendants, Daryl F. Gates, Matthew Hunt, Ronald Frankel, Ronald Banks, Paul Jefferson, and Bob Hansohn, all former or present senior commanders in the Los Angeles Police Department,[1] seek a writ of mandate to compel the respondent court to sustain a demurrer to two of six causes of action in the first amended complaints brought by plaintiffs, Takeo Hirata, Fidel Lopez, and Reginald Denny. We conclude that under plaintiffs' two state law causes of action, no monetary damages may be recovered for the alleged discriminatory deployment of police officers during a riot. In so holding, we determine: the Torts Claims Act provides an immunity from money damages for the failure to provide sufficient police protective services during a riot; that immunity for failing to provide sufficient police protective services applies only to monetary claims but *not* to requests for equitable relief; that racially neutral immunity from damages does not violate the equal protection clause of the United States Constitution; and no right to monetary damages arises from a violation of the equal protection provisions of the California Constitution. Therefore, the demurrers should have been sustained without leave to amend as to plaintiffs' two state law claims and accordingly we issue our writ of mandate.

### II. THE FIRST AMENDED COMPLAINTS

#### A. Overview of Federal and State Causes of Action

The present litigation arises out of the riot which began on April 29, 1992, in Los Angeles after several Los Angeles police officers were not convicted of charges arising out of a criminally excessive force case tried in Ventura County. The operative pleadings of the three plaintiffs, the first amended complaints, all of which are essentially identical, contain six causes of action. The first four causes of action arise under title 42 United States Code sections 1983, 1985(3), and 1986 for violations of federal civil rights. Although the facts underlying the federal civil rights claims are pertinent to the present case, which involves allegations of violations of state law, no issue has been raised either in the trial court or in this proceeding concerning the sufficiency of the allegations in the first amended complaints as to the first four causes of action. Those causes of action remain for resolution via: a trial; summary judgment motion; judgment on the pleadings motion; other appropriate procedural device; or settlement.

---

[1] All future references to the department are to the Los Angeles Police Department.

Rather, the issue before this court relates solely to the alleged violations of Civil Code sections 51.7 and 52[2] in the fifth and sixth causes of action

---

[2]Civil Code section 51.7 provides: "(a) All persons within the jurisdiction of this state have the right to be free from any violence, or intimidation by threat of violence, committed against their persons or property because of their race, color, religion, ancestry, national origin, political affiliation, sex, sexual orientation, age, disability, or position in a labor dispute, or because another person perceives them to have one or more of those characteristics. The identification in this subdivision of particular bases of discrimination is illustrative rather than restrictive. [¶] This section does not apply to statements concerning positions in a labor dispute which are made during otherwise lawful labor picketing. [¶] (b) As used in this section, 'sexual orientation' means heterosexuality, homosexuality, or bisexuality." Civil Code section 52 states: "(a) Whoever denies, aids or incites a denial, or makes any discrimination or distinction contrary to Section 51 or 51.5, is liable for each and every offense for the actual damages, and any amount that may be determined by a jury, or a court sitting without a jury, up to a maximum of three times the amount of actual damage but in no case less than one thousand dollars ($1,000), and any attorney's fees that may be determined by the court in addition thereto, suffered by any person denied the rights provided in Section 51 or 51.5. [¶] (b) Whoever denies the right provided in Section 51.7, or aids, incites, or conspires in that denial, is liable for each and every offense for the actual damages suffered by any person denied that right and, in addition, the following: [¶] (1) An amount to be determined by a jury, or a court sitting without a jury, for exemplary damages. [¶] (2) A civil penalty for twenty-five thousand dollars ($25,000) to be awarded to the person denied the right provided by Section 51.7. [¶] (3) Attorney's fees as may be determined by the court. [¶] (c) Whenever there is reasonable cause to believe that any person or group of persons is engaged in conduct of resistance to the full enjoyment of any of the rights hereby secured, and that conduct is of that nature and is intended to deny the full exercise of the rights herein described, the Attorney General, any district attorney or city attorney, or any person aggrieved by the conduct may bring a civil action in the appropriate court by filing with it a complaint. The complaint shall contain the following: [¶] (1) The signature of the officer, or, in his or her absence, the individual acting on behalf of the officer, or the signature of the person aggrieved. [¶] (2) The facts pertaining to the conduct. [¶] (3) A request for preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order against the person or persons responsible for the conduct, as the complainant deems necessary to insure the full enjoyment of the rights herein described. [¶] (d) Whenever an action has been commenced in any court seeking relief from the denial of equal protection of the laws under the Fourteenth Amendment to the Constitution of the United States on account of race, color, religion, sex, national origin, or disability, the Attorney General or any district attorney or city attorney for or in the name of the people of the State of California may intervene in the action upon timely application if the Attorney General or any district attorney or city attorney certifies that the case is of general public importance. In that action the people of the State of California shall be entitled to the same relief as if it had instituted the action. [¶] (e) Actions under this section shall be independent of any other remedies or procedures that may be available to an aggrieved party. [¶] (f) Any person claiming to be aggrieved by an alleged unlawful practice in violation of Section 51 or 51.7 may also file a verified complaint with the Department of Fair Employment and Housing pursuant to Section 12948 of the Government Code. [¶] (g) Nothing in this section shall be construed to require any construction, alteration, repair, structural or otherwise, or modification of any sort whatsoever to any new or existing establishment, facility, building, improvement, or any other structure, or to augment, restrict, or alter in any way the authority of the State Architect to require construction, alteration, repair, or modification that the State Architect otherwise possesses

respectively. We summarize each of the first amended complaints collectively because the material factual allegations are, aside from the identity of the plaintiffs, all the same. The first amended complaints were organized into seven separate areas of factual allegations. The seven areas relevant to our discussion are: (1) the historical setting and identity of defendants; (2) the policy of discrimination in allocation of police protection services; (3) the implementation of that policy on April 29 and 30, 1992, in the withdrawal of police officers; (4) allegations as to the role of the individual defendants in the withdrawal of police protective services and the failure to deploy an adequate number of officers; (5) plaintiffs' injuries; (6) the fifth cause of action for violations of Civil Code section 51.7; and (7) the sixth cause of action for violations of Civil Code section 52. In reviewing the factual allegations of the first amended complaints, we must accept them as true. (*Aubry* v. *Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 967 [9 Cal.Rptr.2d 92, 831 P.2d 317].)

### B. *The Relevant First Amended Complaints' Allegations Concerning the Two State Causes of Action*

#### 1. *The Historical Setting and Identity of Defendants*

On April 29, 1992, each defendant was a senior supervisor in the department. Their ranks and responsibilities were as follows as alleged in the first amended complaints: Chief Gates; Deputy Chief Hunt, commander of the department's South Bureau which consisted of the Harbor, 77th Street, and southeast divisions; Deputy Chief Frankel; Commander Banks, assistant commanding officer of South Bureau; Captain Hansohn, the 77th Street division commander; and Captain Jefferson. The first amended complaints later detailed their respective roles on April 29 and 30, 1992. On April 27, 1992, while the jury was deliberating in Ventura County, Chief Gates announced to his officers that acquittals could lead to "civil disturbance, rioting and looting." He made the same announcement to his officers on April 29, 1992. Further, the first amended complaints alleged defendants should have known that civil disturbances would occur in the event of acquittals in "areas composed of Black, Hispanic, and Asian citizens" and "South Central Los Angeles."[3]

#### 2. *The Policy of Discrimination in the Allocation of Police Protective Services*

According to the first amended complaints, defendants had adopted a policy of not training or preparing their officers because of an intent to

pursuant to other laws. [¶] (h) For purposes of this section, 'actual damages' means special and general damages. This subdivision is declaratory of existing law."

[3]In reciting the amended complaints' factual allegations, we are required to accept them as true solely for purposes of this opinion. Our recitation of plaintiffs' factual allegations may not be construed as anything else.

discriminate against persons present in South Central Los Angeles "with respect to the provision of police services." Pursuant to that discriminatory intent, defendants "redirected police resources" to "areas in the City composed predominantly of Anglo populations." Despite knowledge of when the verdicts would be announced, defendants "failed to mobilize officers in the Los Angeles Police Department to respond to the same." By contrast, the Los Angeles Sheriff's Department was on tactical alert at 10 a.m. on April 29, 1992.

### 3. *The Withdrawal of Officers and the Failure to Provide Police Protective Services*

At 4 p.m., violence broke out at the intersection of Normandie and Florence Avenues of which defendants were all aware.[4] Pursuant to the aforementioned "policy of discrimination in the distribution of police resources," police protection services were withdrawn from minority communities and simultaneously deployed aggressively in "predominantly . . . Anglo populations." At approximately 6 p.m. on April 29, 1992, pursuant to the aforementioned policy of discrimination in the allocation of police resources, defendants "withdrew police officers from the area . . . around Florence and Normandie" avenues for the purposes of denying citizens and other persons near the intersection "protective services." With the "withdrawal of police officers" from that intersection, a signal was given to rioters that crime "would go unrestrained." With the police withdrawal, officers were directed "not to respond" to crime near the intersection. Further, officers were ordered "not to respond to 9-1-1 calls for emergency assistance . . . ." The reason that emergency calls were not to be responded to was for the purpose of "denying" persons near the intersection "protective services."

### 4. *Allegations Concerning Individual Defendants*

#### a. *Chief Gates*

It was alleged Chief Gates left Parker Center shortly after 6 p.m. to attend a political fundraiser and admitted there was a "willful failure to deploy police resources" and that "some people . . . were going to go without police assistance . . . ." Further, plaintiffs alleged at this time "Chief Gates had no intention to redeploy police officers in minority neighborhoods" and "officers . . . remained undeployed for over six hours . . . ." Further, it was alleged that Chief Gates had "in prior civil disturbances, including the Watts riots" withdrawn "L.A.P.D. resources" and failed "to redeploy said resources" in minority communities.

---

[4] All future references to the intersection of Normandie and Florence Avenues will be to the "intersection."

### b. *Deputy Chief Frankel*

As to Deputy Chief Frankel, it was alleged he "assumed partial command" of the department at 4 p.m. on April 29, 1992, and with knowledge of the escalating violence, "refused to deploy or facilitate the deployment" of officers with the "intent to deny protective services" for unlawful discriminatory reasons. At 5:45 p.m., another defendant, who is not a party to this proceeding, Lieutenant Michael Moulin, the 77th Street division watch commander, directed department radio and computer terminal dispatchers not to "send police officers into the intersection . . . ." Later, Lieutenant Moulin "refused to deploy and/or facilitate the deployment of police officers" throughout South Central Los Angeles with the intent to deprive "protective services to citizens . . . in minority neighborhoods."

### c. *Deputy Chief Hunt*

As to Deputy Chief Hunt, it was alleged he assumed command of the "Field Command Post" after 6 p.m. on April 29, 1992, and at 7 p.m. "ordered the withdrawal of police officers away from the intersection . . . ." This order was made with the intent to deny those in the area "protective services . . . ." Further, Deputy Chief Hunt was alleged to have "refused to deploy or facilitate the deployment of police officers into surrounding minority neighborhoods throughout South Central Los Angeles with the intent to deny municipal services . . . in minority neighborhoods."

### d. *Commander Banks*

As to Commander Banks, it was alleged he was assigned as the "Executive Officer of the Field Command Post" by Deputy Chief Hunt. Commander Banks "ordered the withdrawal of police officers away from the intersection . . . with the intent to deny citizens [in the area] protective services . . . ." Commander Banks allegedly later refused to "deploy or facilitate the deployment of police officers into . . . minority neighborhoods."

### e. *Captain Hansohn*

As to Captain Hansohn, he was appointed by Deputy Chief Hunt as the "Personnel Officer of the Field Command Post . . . ." He too "ordered the withdrawal of police officers away from the intersection" and with the intent to deprive those in the area of "municipal and county services."

### f. *Captain Jefferson*

Captain Jefferson ordered the withdrawal of the officers away from the intersection for the purposes of denying "protective services." He further

ordered officers to the "Field Command Post" where they remained until after midnight on April 30, 1992.

g. *The 1,790 Officers in the Field Command Post but Not on the Streets in Minority Neighborhoods*

By 12 midnight on April 30, 1992, there were 1,790 officers in the "Field Command Post" "as a result of defendants' deliberate and systematic withdrawal of police resources from minority neighborhoods . . . ." Further, defendants "refused to deploy or facilitate the deployment of police officers into the surrounding minority" neighborhoods. Between 6 p.m. on April 29, 1992, and midnight on April 30, 1992, officers at the "Field Command Post" became angry because they "had a strong desire to provide protective services" but defendants ordered them not to do so "pursuant to . . . [the] aforementioned policy of discrimination in the distribution of police services . . . ." Moreover, in the absence of this policy, the angry officers in the "Field Command Post . . . would have in fact provided protective services" to persons near the intersection. Meanwhile, in predominantly Anglo communities, there was a "significant and visible police presence . . . ." This was pursuant to the "policy of [racial] discrimination in the distribution of police resources . . . ." The effect of that policy was to have a "significant and visible" number of officers in predominantly Anglo communities "while simultaneously withdrawing its resources from South Central Los Angeles . . . ." Further, between April 29, 1992, and May 4, 1992, there were more arrests in Valley Bureau than in South Bureau of the department. The difference in arrest rates "was the direct result of defendants' aforementioned policy of discrimination in the distribution of police resources . . . ."

5. *Plaintiffs' Injuries*

The three first amended complaints alleged that plaintiffs were in the intersection. While there, they were attacked by members of a mob. Because no Los Angeles police officers were present, "ordinary citizens" saved plaintiffs' lives. Plaintiffs seek monetary compensation for their personal injuries.

6. *Fifth Cause of Action*

The fifth cause of action was entitled: "(Violation of Civil Rights) [CIVIL CODE SECTION 51.7]." The fifth cause of action alleged plaintiffs were deprived of equal protection of the laws by: "[the act of] withdrawing protective services and failing to deploy and redeploy police officers"; the act of "simultaneously aggressively deploying police resources in communities inhabited by predominately Anglo Citizens"; thereby depriving persons

in "minority neighborhoods of the right to be free from violence"; "the withdrawal of police officers from the intersection . . ."; forbidding "officers from responding to 9-1-1 calls" and "responding to acts of violence" near the intersection; and "increas[ing] the vulnerability of individuals" at the intersection and depriving residents in the area "of the right to be free from violence . . . ." Plaintiffs sought money damages.

### 7. *Sixth Cause of Action*

The sixth cause of action was entitled: "(Violation of Civil Rights) [CIVIL CODE SECTION 52]." The sixth cause of action adopted all of the other allegations of the first amended complaints. It alleged all defendants conspired with one another to implement the aforementioned unlawful discriminatory policies. Defendants violated plaintiffs' civil rights by "purposely engaging in a policy of discrimination in the distribution of protective services." Plaintiffs sought monetary relief only.

### III. DISCUSSION

### A. *Standard of Review*

■ Because we are reviewing the sufficiency of a pleading, we apply the following standard of review: "The reviewing court gives the complaint a reasonable interpretation, and treats the demurrer as admitting all material facts properly pleaded. [Citations.] The court does not, however, assume the truth of contentions, deductions or conclusions of law. [Citation.] . . . However, it is error for a trial court to sustain a demurrer when the plaintiff has stated a cause of action under any possible legal theory. [Citation.]" (*Aubry* v. *Tri-City Hospital Dist., supra,* 2 Cal.4th at pp. 966-967.) ■ Because the present case involves the application of a governmental immunity to a pleading, we also apply the test articulated in *Lopez* v. *Southern Cal. Rapid Transit Dist.* (1985) 40 Cal.3d 780, 792-793 [221 Cal.Rptr. 840, 710 P.2d 907], where the California Supreme Court held: "It is well established that the allegations of a complaint must be liberally construed with a view to attaining substantial justice between the parties [citations]. We have also held that, 'in governmental tort cases "the rule is liability, immunity is the exception" . . . . Unless the Legislature has clearly provided for immunity, the important societal goal of compensating injured parties for damages caused by willful or negligent acts must prevail.' [Citation.]" Because the present case involves claims against public employees and is controlled by the California Tort Claims Act, the following rules apply: "However, because under the Tort Claims Act all governmental tort liability is based on statute, the general rule that statutory causes of action

must be pleaded with particularity is applicable. Thus, 'to state a cause of action against a public entity, every fact material to the existence of its statutory liability must be pleaded with particularity.' [Citations.]" (*Id.* at p. 795.) It is a plaintiff's responsibility to plead " 'facts sufficient to show [his or her] cause of action lies outside the breadth of any applicable statutory immunity.' [Citation.]" (*Id.* at p. 796.)

### B. *The Section 845 Immunity From Monetary Damages*

#### 1. *Introduction*

The respondent court should have sustained defendants' demurrer without leave to amend. All of plaintiffs' claims are premised upon a failure to provide adequate police protection at the intersection where they were attacked. Defendants are immune from civil liability for money damages for failing to provide adequate police protection against participants in criminal conduct during a riot. Government Code[5] section 845 provides: "Neither a public entity nor a public employee is liable for failure to establish a police department or otherwise to provide police protection service or, if police protection service is provided, for failure to provide sufficient police protection service." Based on this specific immunity, which protects defendants from the duty of paying money damages, the demurrer should have been sustained without leave to amend. ■ We emphatically state that section 845 only provides an immunity from the payment of money damages. The first amended complaint alleges an ongoing deliberate racially based misallocation of police resources, but does not seek future equitable relief. Section 845 is only an immunity from the payment of monetary damages—it is inapplicable to a suit for equitable relief. (§ 814; Cal. Government Tort Liability Practice (Cont.Ed.Bar 1992) § 2.109, pp. 201-205.) To deliberately reduce the number of police officers in a minority community, because of the residents' race, is an undemocratic act of indescribable inhumanity. This opinion, which discusses the section 845 immunity from the duty to pay monetary damages, may not be read that equitable relief is unavailable when police supervisors discriminate in the deployment of protective resources for racial reasons.

In determining the scope of the section 845 immunity from money damages, we must interpret the statute to carry out the Legislature's intent. Our Supreme Court has noted: "When interpreting a statute our primary task is to determine the Legislature's intent. [Citation.] In doing so we turn first to the statutory language, since the words the Legislature chose are the best indicators of its intent." (*Freedom Newspapers, Inc.* v. *Orange County Employees Retirement System* (1993) 6 Cal.4th 821, 826 [25 Cal.Rptr.2d 148,

[5]Unless otherwise indicated, all future statutory references are to the Government Code.

863 P.2d 218]; *People* v. *Jones* (1993) 5 Cal.4th 1142, 1146 [22 Cal.Rptr.2d 753, 857 P.2d 1163].) Further, our Supreme Court has noted: " 'If the language is clear and unambiguous there is no need for construction, nor is it necessary to resort to indicia of the intent of the Legislature (in the case of a statute) . . . .' " (*Delaney* v. *Superior Court* (1990) 50 Cal.3d 785, 798 [268 Cal.Rptr. 753, 789 P.2d 934].) However, the literal meaning of a statute must be in accord with its purpose as our Supreme Court noted in *Lakin* v. *Watkins Associated Industries* (1993) 6 Cal.4th 644, 658-659 [25 Cal.Rptr.2d 109, 863 P.2d 179], as follows: "We are not prohibited 'from determining whether the literal meaning of a statute comports with its purpose or whether such a construction of one provision is consistent with other provisions of the statute. The meaning of a statute may not be determined from a single word or sentence; the words must be construed in context, and provisions relating to the same subject matter must be harmonized to the extent possible. [Citation.] Literal construction should not prevail if it is contrary to the legislative intent apparent in the [statute] . . . .' " In *Lungren* v. *Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299], our Supreme Court added: "The intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act. [Citations.] An interpretation that renders related provisions nugatory must be avoided [citation]; each sentence must be read not in isolation but in light of the statutory scheme [citation] . . . ." ■ Further, in interpreting the Tort Claims Act, we are mindful that our Supreme Court has noted: " '[T]he intent of the [Tort Claims Act] is not to expand the rights of plaintiffs in suits against governmental entities, but to confine potential governmental liability to rigidly delineated circumstances: immunity is waived only if the various requirements of the act are satisfied.' [Citation.]" (*Brown* v. *Poway Unified School Dist.* (1993) 4 Cal.4th 820, 829 [15 Cal.Rptr.2d 679, 843 P.2d 624]; accord, *Williams* v. *Horvath* (1976) 16 Cal.3d 834, 838 [129 Cal.Rptr. 453, 548 P.2d 1125]; *Chester* v. *State of California* (1994) 21 Cal.App.4th 1002, 1008, fn. 10 [26 Cal.Rptr.2d 575]; *City of Los Angeles* v. *Superior Court* (1993) 14 Cal.App.4th 621, 627 [17 Cal.Rptr.2d 703]; *Fisher* v. *Pickens* (1990) 225 Cal.App.3d 708, 715-716 [275 Cal.Rptr. 487]; *McCauley* v. *City of San Diego* (1987) 190 Cal.App.3d 981, 991 [235 Cal.Rptr. 732]; *Shields* v. *County of San Diego* (1984) 155 Cal.App.3d 103, 113 [202 Cal.Rptr. 30]; *Longfellow* v. *County of San Luis Obispo* (1983) 144 Cal.App.3d 379, 385 [192 Cal.Rptr. 580]; *Keyes* v. *Santa Clara Valley Water Dist.* (1982) 128 Cal.App.3d 882, 886 [180 Cal.Rptr. 586]; *Harland* v. *State of California* (1979) 99 Cal.App.3d 839, 845-846 [160 Cal.Rptr. 613]; *Galli* v. *State of California* (1979) 98 Cal.App.3d 662, 674-675 [159 Cal.Rptr. 721].)

## 2. Development of Law Concerning Public Entity and Employee Liability for Monetary Damages for Failure to Respond to a Riot

In order to understand the applicability of section 845 to decisions by police commanders not to allocate resources in a riot environment, it is necessary to review the development of the law in connection with municipal liability for money damages resulting from mob violence.

### a. Monetary Property Damage Liability Resulting From a Riot Prior to the 1963 Adoption of the Tort Claims Act

The 1963 enactment of section 845 and related immunities constituted a radical departure from then existing law relating to government's liability to pay money damages for property losses resulting from mob violence. Prior to the 1963 adoption of section 845, both in England and in this country, the traditional rule had provided for governmental financial liability for property damage caused by a mob. In *Agudo* v. *County of Monterey* (1939) 13 Cal.2d 285, 287 [89 P.2d 400], the California Supreme Court noted: "The genesis of the principle involved has been traced to the Statute of Winchester enacted in 1285 (1 Stat. 13 Edw. I, p. 2, ch. 3), which provided that a person robbed might sue the inhabitants of the hundred or county in which the robbery had taken place. In ancient England, the individual inhabitants of each community were in theory responsible for the preservation of peace and order therein; hence it was considered just to impose civil liability upon them for damage to property resulting from criminal disorders which should not have been permitted. (See 25 Halsbury's Laws of England, 2d ed., 359.) The American statutes rest largely upon the same fundamental principle. Local subdivisions of government which have been invested with police power to maintain law and order are subjected to a correlative liability for injuries to property occasioned by rioters. [Citation.] [¶] The prototype of the present American statutes is found in a section of the statute 1 Geo. I, St. 2, Ch. 5, commonly known as the 'Riot Act'. In the main the act was penal, making it a felony to engage in riots or public tumults, but one clause (section 6) created civil liability against the inhabitants of the hundred in which a riot had resulted in injury to private property. Liability was measured by the loss sustained, and consequently actions brought under this section of the act were held to be primarily remedial in spite of the fact that it was embodied in a statute which was otherwise entirely penal." Later, the *Agudo* court held: "In various American jurisdictions statutes based upon section 6 of the English Riot Act usually have provided for compensatory damages to the person whose property was injured or destroyed, and in construing them the courts have generally followed the English view that the sufferer's right to damages is remedial. [Citations.]" (*Id.* at p. 288.)

Consistent with the development of law in England and other parts of the country, in 1868, the California Legislature adopted a comprehensive statute which provided for, among other things: financial liability on the part of a city or county for damage to real or personal property as a consequence of any riot; that the defense of contributory negligence was available to the public entity; a statutorily mandated duty on the part of the mayor or sheriff to take all legal means to protect property from a riot; and a one year statute of limitations under most circumstances. (Stats. 1867-1868, ch. CCCXLIV §§ 1-8, pp. 418-419.) In 1872, upon the adoption of the code system in California, the 1868 legislation was codified as Political Code section 4452. After several further modifications, it was recodified as former section 50140 which provided: "A local agency is responsible for damages by mobs or riots to property within its boundaries." (Stats. 1949, ch. 81, § 1, p. 259.)

In 1961, the California Supreme Court abrogated the doctrine of sovereign immunity in *Muskopf* v. *Corning Hosp. Dist.* (1961) 55 Cal.2d 211, 219-220 [11 Cal.Rptr. 89, 359 P.2d 457]. Prior to *Muskopf*, public entities and their employees were immune from suit based on the doctrine of sovereign immunity except as follows: where liability was provided by statute; when the public entity engaged in a proprietary as distinguished from governmental activity; in connection with nuisance claims; or where private property was taken for a public use under circumstances constituting inverse condemnation. (Van Alstyne, *Governmental Tort Liability: Judicial Lawmaking in a Statutory Milieu* (1963) 15 Stan.L.Rev. 163, 166; Kennedy & Lynch, *Some Problems of a Sovereign Without Immunity* (1963) 36 So.Cal.L.Rev. 161, 164.) When the *Muskopf* decision was issued, the California Law Revision Commission was in the process of a reevaluation of the doctrine of sovereign or governmental immunity as a result of a 1957 Assembly resolution which authorized the following action: "A study to determine whether the doctrine of sovereign or governmental immunity in California should be abolished or revised." (Assem. Conc. Res. No. 22, Stats. 1957 (Reg. Sess.) res. ch. 202, p. 4590.) On January 2, 1963, the commission issued a study which recommended an expansion of former section 50140 et seq. When *Muskopf* was decided, former section 50140 only provided for governmental liability for property damage occasioned by mob actions. (Stats. 1949, ch. 81, § 1, p. 259.) The study, authored by Professor Arvo Van Alstyne of the School of Law at the University of California at Los Angeles, recommended that public entity financial liability be extended to personal injuries as well as property damage resulting from a riot. (Study Relating to Sovereign Immunity (Jan. 1963) 5 Cal. Law Revision Com. Rep. (1963) pp. 451-452.)

However, when the Law Revision Commission issued its recommendations for reform of the governmental tort system, the entire English and

American legal tradition of public entity liability for property damage during a riot, as well as Professor Van Alstyne's recommendation, were rejected. Rather, the commission recommended the adoption of immunities from potential money damages for the failure of public entities and employees to enforce the law *and* the repeal of section 50140 et seq. The commission stated: "For similar reasons, public entities and their employees should not be liable for inadequate enforcement of any law or regulation or for failure to take steps to regulate the conduct of others. The extent and quality of governmental service to be furnished is a basic governmental policy decision. Public officials must be free to determine these questions without fear of liability either for themselves or for the public entities that employ them if they are to be politically responsible for these decisions. [¶] The remedy for officials who make bad law, who do not adequately enforce existing law, or who do not provide the people with services they desire, is to replace them with other officials. But their discretionary decisions in these areas cannot be subject to review in tort suits for damages if government is to govern effectively. [¶] Public entities and public employees should not be liable for failure to make arrests or otherwise to enforce any law . . . . Moreover, if liability existed for this type of activity, the risk exposure to which a public entity would be subject would include virtually all activities going on within the community. There would be potential governmental liability . . . for all crimes . . . . No private person is subjected to risks of this magnitude. In many of these cases, there is some person (other than the public employee) who is liable for the injury, but the liability is sought to be imposed on government for failing to prevent that person from causing the injury. The Commission believes that it is better public policy to leave the injured person to his [or her] remedy against the person actually causing the injury than it is to impose an additional liability on government for negligently failing to prevent the injury. . . . [¶] Sections 50140 through 50145 of the Government Code are inconsistent with the foregoing recommendations. These sections impose absolute liability upon cities and counties for property damage caused by mobs or riots within their boundaries. These sections are an anachronism in modern law. They are derived from similar English laws that date back to a time when the government relied on local townspeople to suppress riots. The risk of property loss from mob or riot activity is now spread through standard provisions of insurance policies. Accordingly, these sections should be repealed." (Recommendation Relating to Sovereign Immunity, No. 1, Tort Liability of Public Entities and Public Employees (Jan. 1963) 4 Cal. Law Revision Com. Rep. (1963) pp. 817-818.)

As a result, the commission recommended the adoption of section 845 as it was ultimately enacted verbatim by the Legislature. The commission's comment to section 845 stated: "This section grants a general immunity for

failure to provide police protection or for failure to provide enough police protection. Whether police protection should be provided at all, and the extent to which it should be provided, are political decisions which are committed to the policy-making officials of government. To permit review of these decisions by judges and juries would remove the ultimate decision-making authority from those politically responsible for making the decisions." (Recommendation Relating to Sovereign Immunity, No. 1, Tort Liability of Public Entities and Public Employees (Jan. 1963) 4 Cal. Law Revision Com. Rep. (1963) p. 860.)

The commission's recommendations were sent to the Legislature. The sponsor of the 1963 tort legislation recommended by the Law Revision Commission was Senator James A. Cobey. While the legislation was pending in the Senate, the report prepared by the Senate Judiciary Committee stated in connection with former section 50140, "Mob and riot damage liability would be eliminated." (Com. on Jud., Rep. (1963) Appen. to Sen. J. Supp. (1963 Reg. Sess.) p. xiv.)

When the Tort Claims Act was finally adopted, section 50140 and its related provisions were repealed. (Stats. 1963, ch. 1681, § 17, p. 3286.) This eliminated governmental financial liability arising out of a riot for property damage. Notably, this amendment abrogated that rule of law which had been in effect in California since 1868. Further, it was inconsistent with the general American rule providing for such liability which found its basis in English law adopted in 1285. (*Agudo* v. *County of Monterey*, *supra*, 13 Cal.2d at p. 287.)

Apart from the repeal of section 50140 et seq., the 1963 legislation provided a number of immunities from monetary damages related to police and correctional activities. Section 818.2 provided that a public entity was not liable for "failing to enforce any law." (Stats. 1963, ch. 1681, § 1, p. 3268.) The Law Revision Commission comment to section 818.2 stated: "This section would be unnecessary except for a possible implication that might arise from Section 815.6, which imposes liability upon public entities for failure to exercise reasonable diligence to comply with a mandatory duty imposed by an enactment. This section recognizes that the wisdom of legislative or quasi-legislative action, and the *discretion of law enforcement officers in carrying out their duties*, should not be subject to review in tort suits for damages if political responsibility for these decisions is to be retained." (4 Cal. Law Revision Com. Rep. (Jan. 1963) p. 841, italics added.) The immunity from money damages for public entities for failing to enforce an enactment was also provided for public employees in section 821 which stated: "A public employee is not liable for an injury caused by his [or her]

adoption of or failure to adopt an enactment or by [her or] his failure to enforce an enactment." (Stats. 1963, ch. 1681, § 1, p. 3269.) The Law Revision Commission comment to section 821 stated: "This section continues an existing immunity of public employees. *Martelli* v. *Pollock*, 162 Cal.App.2d 655, 328 P.2d 795 (1958) (city councilman immune for actions as councilman); *Rubinow* v. *County of San Bernardino*, 169 Cal.App.2d 67, 336 P.2d 968 (1959) (no liability for failure to arrest drunk driver)." (4 Cal. Law Revision Com. Rep. (Jan. 1963) p. 844.) Further, the 1963 legislation provided, subject to certain exceptions: for immunity from financial damages for injuries sustained by persons in police custody in section 844.6; for the failure to provide a prison or to properly equip one in section 845.2; subject to various limitations, an immunity from monetary damages for failure to provide proper medical care for a prisoner as set forth in section 845.6; for the release of a prisoner or for damage occurring because of an escape (§ 845.8); and for failing to arrest or retain an arrestee in custody. (§ 846.) (Stats. 1963, ch. 1681, § 1, pp. 3277-3279.) As noted previously, section 845 was adopted by the Legislature as proposed by the commission. Section 845 was clearly intended to immunize public entities and employees from monetary property damage claims arising out of the failure to provide "sufficient police protection service" during a riot.

b. *The Pre-Muskopf Immunities From Monetary Damages for Personal Injury Under All Circumstances and Property Damage Occurring Other Than During a Riot*

The development of the law concerning police officer liability for personal injuries for failure to provide sufficient police protective services has been much less complex than its property damage due to mob violence counterpart. The same analysis applies to peace officer responsibility for property damage, occurring other than during a riot, and personal injury liability by reason of the failure to enforce the law. Prior to *Muskopf*, public entities and employees received the benefit of the sovereign immunity doctrine which provided immunity for "governmental" activities. (See *Muskopf* v. *Corning Hospital Dist., supra*, 55 Cal.2d at p. 217.) Activities relating to law enforcement, including the failure to enforce a law or make an arrest, except for property damage occurring during a riot which was the subject of a specific statute providing for liability, were always recognized as governmental in nature. Therefore, there was no liability for nonriot related property damage and all personal injuries occasioned by the failure to enforce the law. (*Tomlinson* v. *Pierce* (1960) 178 Cal.App.2d 112, 115-116 [2 Cal.Rptr. 700]; *Shipley* v. *City of Arroyo Grande* (1949) 92 Cal.App.2d 748, 751 [208 P.2d 51]; *Campbell* v. *City of Santa Monica* (1942) 51 Cal.App.2d 626, 629 [125 P.2d 561]; see *Rubinow* v. *County of San Bernardino* (1959) 169 Cal.App.2d 67, 68-70 [336 P.2d 968]; Study Relating to

Sovereign Immunity (Jan. 1963) 5 Cal. Law Revision Com. Rep. (1963) pp. 443-452; Recommendation Relating to Sovereign Immunity, No. 1, Tort Liability of Public Entities and Public Employees (Jan. 1963) 4 Cal. Law Revision Com. Rep. (1963) p. 844.) The Legislature certainly intended to continue these pre-*Muskopf* immunities. As noted previously, the commission specifically recommended public employees and entities "should not be liable for inadequate enforcement of any law . . . ." (Recommendation Relating to Sovereign Immunity, No. 1, Tort Liability of Public Entities and Public Employees (Jan. 1963) 4 Cal. Law Revision Com. Rep. (1963) p. 818.) The Legislature also enacted broadly worded immunities from possible financial liability which resurrected the pre-*Muskopf* immunity from personal injury liability for failure to enforce the law in all circumstances, including during a riot as well as for property damage occurring other than as a result of mob action. (§§ 818.2, 821, 844.5, 845, 845.2, 845.6, 845.8, 846.) The immunities from monetary damages and the pertinent law revision comments have all been previously discussed in part III(B)(2)(a) relating to property damage liability during a riot. To sum up, the Tort Claims Act recreated pre-*Muskopf* immunities from the duty to pay money damages for failure to enforce the law. The only significant change was that section 50140 et seq. was repealed, thereby increasing the scope of the money damage immunity for failure to provide adequate police protection services beyond that in existence prior to *Muskopf*.

### c. *The Susman Decision*

The only court decision to analyze the effect of section 845 in the riot context was *Susman* v. *City of Los Angeles* (1969) 269 Cal.App.2d 803, 808-822 [75 Cal.Rptr. 240]. The *Susman* opinion was concurred in by Associate Justice James A. Cobey, who as a Senator was the sponsor of the Tort Claims Act of 1963. In *Susman*, owners of real and personal property filed suit when in August 1965 rioters destroyed their personal and real property. The third cause of action alleged that police officers of the defendant, City of Los Angeles, had failed to properly disperse and control angry crowds. The *Susman* court held: "A fair reading of those allegations leads to the conclusion that the core of the plaintiffs' assertion of liability is that the City of Los Angeles failed to provide sufficient police protection service in that certain employees failed and refused to carry out the orders of their superior officers. But we are here concerned with the liability of the public entity and, as discussed with respect to the first cause of action, section 845 . . . grants a general immunity to public entities for failure to provide sufficient police protection. There is no statutory exception to the rule of immunity where the failure to provide such protection is due to the acts or omissions of subordinate employees such as are alleged in the third

cause of action. Moreover, as hereinabove noted, it is provided in section 818.2 . . . that a public entity is not liable for an injury caused by the failure to enforce any law." (*Id.* at p. 813, fn. omitted.) In a footnote to the foregoing analysis, the *Susman* court, while interpreting section 845, stated: "Professor Van Alstyne has stated: 'The immunity in § 818.2 prevails over statutory entity liabilities that do not clearly indicate otherwise. . . . For example, it supersedes the liability imposed by [Gov. Code] § 815.6 for failure to discharge a mandatory duty. . . . Under case law prior to *Muskopf* . . . , failure of public officials to enforce the law was uniformly regarded as nonactionable "governmental" matter (even though negligent or otherwise wrongful) in the absence of a statute imposing liability. [Citations.] . . . The immunity for failure to enforce the law conferred by the California Tort Claims Act appears designed to insure continuation of the same immunity that previously was recognized.' [Citation.]" (269 Cal.App.2d at pp. 813-814, fn. 6.)

At another point in the analysis of the complaint in *Susman*, the court referred to the second cause of action and noted: "Insofar as it is alleged in the second cause of action that the State of California and the City of Los Angeles failed to disperse the crowd which had assembled, no cause of action was stated, because, as noted in the discussion as to the first cause of action, a public entity is not liable for injury arising from a failure to provide sufficient police protection service (Gov. Code, § 845) or caused by failure to enforce any law (Gov. Code, § 818.2)." (269 Cal.App.2d at p. 812.) Further, the *Susman* court applied the section 845 immunity to causes of action based upon: failure to disperse an assembled angry crowd (269 Cal.App.2d at p. 811); the fact subordinate police officers would not follow their supervisors' orders (*id.* at p. 813); the failure to properly utilize police intelligence officers (*id.* at p. 814); the neglect on the part of public officials to respond to "problems and motivations of persons" residing in the areas where riots were occurring (*id.* at p. 815); the fact tear gas was not properly used to disperse crowds (*id.* at pp. 815-816); the delay in summoning the National Guard which resulted in "inadequate police protection service" (*id.* at p. 816); the fact the Lieutenant Governor was out of the city when the police chief requested National Guard assistance (*id.* at p. 817); not securing other means of police protection once it was clear the National Guard would not be immediately available (*id.* at p. 820); the failure to properly plan to utilize the National Guard so that no protection was provided within the area where the plaintiffs' property was located (*id.* at p. 821); and the fact the mayor left the city to go to San Francisco in order to give a speech, thereby creating a complete breakdown of communication both inside and outside the police department which resulted in damage to plaintiffs. (*Id.* at p. 822.) Of special consequence, the *Susman* court noted that the failure to place

police protective services in an area which is the subject of a riot is precisely the kind of decision which is the basis for the section 845 immunity from the obligation to pay money damages. The *Susman* court stated: "Particularly apt with respect to this cause of action is the Law Revision Commission Comment . . . to the effect that the extent to which police protection should be provided—in this case, with respect to the area where plaintiffs' property was located—is a political decision which is committed to the policy-making officials of government and that to 'permit review of these decisions by judges and juries would remove the ultimate decision-making authority for those politically responsible for making the decisions.' Generally, such decisions are particularly difficult to make in the face of an unexpected public calamity." (269 Cal.App.2d at p. 821.)

One final note is in order concerning *Susman*. While discussing the fifth cause of action which related to the failure of city officials to respond to complaints about police misconduct which thereby caused the riot, the Court of Appeal held that plaintiffs could not recover against the city pursuant to the section 845 immunity from money damages. The *Susman* court noted, as has been previously adverted to in this opinion, the relationship between the adoption of section 845 and the repeal of former section 50140 et seq. The court noted: "In the same section [Van Alstyne, Cal. Government Tort Liability (Cont.Ed.Bar 1964) § 716, p. 298], Professor Van Alstyne stated: 'In keeping with this immunity, the 1963 [L]egislature also repealed concurrently the former statutory liability of cities and counties for property damage caused by mob or riot. (See former . . . §§ 50140-50145, repealed by Stats. 1963, ch. 1681, § 17, p. 3286) . . . .' " (*Id.* at p. 815, fn. 7.) *Susman* is the only case to have interpreted the section 845 immunity from paying money damages in the context of a riot and it has not since then been the subject of any criticism by California courts.

### C. *Application of Statutory Interpretation Principles to Section 845*

■ Applying the foregoing considerations to the present case, it is clear that section 845 immunity from payment of monetary damages is applicable to the allegations in the first amended complaints. First, when we turn to the words of section 845 in an effort to determine the law makers' intent (*Delaney* v. *Superior Court, supra,* 50 Cal.3d at p. 798), the conduct alleged in the first amended complaints involves a failure to provide adequate police services. The gravamen of the first amended complaints is that plaintiffs were at the intersection and there were no police present because defendants engaged in discriminatory deployment of law enforcement officers. The first amended complaints each contain 49 references to: the failure to properly train and mobilize officers; the withdrawal of officers from minority neighborhoods; the fact officers were not deployed or redeployed; the failure to

respond to telephone calls for emergency police assistance; the absence of a police response to acts of violence and looting; or the denial of protective services. Such squarely falls within the ambit of a "failure to provide sufficient police protection service." (§ 845.)[6]

Second, apart from the express language of the statute, when section 845 is interpreted "in the light of the statutory scheme [citation]" (*Lungren* v. *Deukmejian, supra,* 45 Cal.3d at p. 735), other provisions of the Tort Claims Act indicate a legislative intent to immunize the police from paying money damages for the failure to properly respond to a riot. As noted previously, section 845 was enacted along with section 818.2, which provided that a public entity was not liable for failure to "enforce any enactment." Similarly, section 821 provided that a public employee was not liable for money damages as a result of her or his "failure to enforce an enactment." Further, sections 845.2, 845.4, 845.6, and 845.8 established a broad set of immunities from the duty to pay damages protecting both police agencies and their employees under varying circumstances from mistreatment of prisoners to the escape of a person in custody. Finally, section 846 provided that neither a public entity nor a public employee was liable for the failure to have made an arrest. When the other provisions of law adopted concurrently with section 845 are considered, the failure to have provided police services in the intersection on the evening of April 29, 1992, was subject to the immunity from the obligation to pay monetary damages for failure to provide adequate law enforcement protection.

Third, when we review the "legislative intent apparent in the [statute]" (*Lungren* v. *Deukmejian, supra,* 45 Cal.3d at p. 735), its application to the present case is apparent. At the time of the 1957 resolution authorizing the Law Revision Commission to commence a study of sovereign immunity and later when the 1961 *Muskopf* opinion was filed, the law was unmistakable: public entities were liable for property damage arising during a riot. However, the Legislature made it abundantly clear that the rule providing for

---

[6]Plaintiffs' return to our order to show cause also emphasized the basis of their Unruh Civil Rights Act claims was the failure to "provide sufficient police protection service." (§ 845.) The return argued defendants' liability was premised on a purposeful implementation of a discriminatory police policy "pursuant to which they withdrew and withheld police protective services from minority neighborhoods." At another point, plaintiffs noted their theory of Unruh Act liability involved "defendants' positive misconduct in deploying their forces based upon a racially discriminatory criteria." Further, the return argued the first amended complaints' allegations at the demurrer stage assumed the following to be true: pursuant to a policy of discrimination, defendants "withdrew and withheld police protective services"; the intent in withdrawing the officers was to deprive "persons residing and present in these communities with police services . . ."; officers were "aggressively deployed" in "majority communities"; and defendants prevented officers from being present at the intersection. These arguments all involve the failure to provide, in the words of section 845, "sufficient police protection service." (§ 845.)

public entity liability under these circumstances would be abrogated and replaced with a rule of immunity from the duty to pay damages. As noted previously, the Law Revision Commission expounded at length concerning the need for an immunity for failure to enforce laws. The commission concluded that section 50140 "should be repealed." (Recommendation Relating to Sovereign Immunity, No. 1, Tort Liability of Public Entities and Public Employees (Jan. 1963) 4 Cal. Law Revision Com. Rep. (1963) p. 818.) Concurrently with the repeal of section 50140 et seq., the Legislature adopted section 845 and its related immunities from payment of money damages. As noted in *Susman*, these simultaneous events are of material consequence in applying section 845. (*Susman* v. *City of Los Angeles, supra*, 269 Cal.App.2d at p. 815, fn. 7.) Finally, as noted in part III(B)(2)(b) of this opinion, the Legislature intended to reenact the pre-*Muskopf* immunities from the payment of monetary damages for personal injury and nonriot related property damage resulting from a failure to enforce the law. Accordingly, the purpose of the legislative enactment was to create an immunity for failing to provide sufficient police protection services during riots on the part of both public entities and their employees. To sum up, when traditional methods of statutory construction are applied to section 845, that immunity from paying money damages applies to the present case.

### D. *Other Decisional Authority Construing Section 845*

Our interpretation of section 845 is consistent with other applications of the statutory immunity which precludes recovery of money damages in the present case. In *Lopez* v. *Southern Cal. Rapid Transit Dist., supra*, 40 Cal.3d at page 792, the Supreme Court noted that the section 845 immunity applied to negligence "in failing to provide police personnel or armed guards on board its buses" but not to negligent acts by a bus driver. In *Peterson* v. *San Francisco Community College Dist.* (1984) 36 Cal.3d 799, 814 [205 Cal.Rptr. 842, 685 P.2d 1193], the plaintiff alleged a failure on the part of a community college district " 'to employ adequate police personnel to patrol the parking lot and stairway . . .' " where a sexual assault occurred. The California Supreme Court held, citing section 845, "As a public entity the district may not, therefore, be held liable in this case for *any* failure to provide adequate police protection." (36 Cal.3d at p. 815, italics added; accord, *Rodriguez* v. *Inglewood Unified School Dist.* (1986) 186 Cal.App.3d 707, 717 [230 Cal.Rptr. 823].) In *Brownell* v. *Los Angeles Unified School Dist.* (1992) 4 Cal.App.4th 787, 791-792 [5 Cal.Rptr.2d 756], a student was standing in front of a high school where he was shot by a gang member. The neighborhood was heavily impacted with gang presence. Citing section 845, this court held: "We note that [the school district] is statutorily immune for any failure to provide police protection." (4 Cal.App.4th at p. 796, fn. 4.)

The Court of Appeal for the Third Appellate District held in *Turner* v. *State of California* (1991) 232 Cal.App.3d 883, 887, 894 [284 Cal.Rptr. 349], the state was immune pursuant to section 845 for the failure to properly patrol a parking lot at a fairgrounds even though it was aware of "gang related violence" in the area. In *Constance B.* v. *State of California* (1986) 178 Cal.App.3d 200, 208, footnote 3 [223 Cal.Rptr. 645], the Court of Appeal for the Third Appellate District accepted the plaintiff's concession that the state did not have a duty to provide police protection at a dangerous and negligently maintained rest stop during nighttime hours, citing section 845. In *Hernandez* v. *Southern California Rapid Transit Dist.* (1983) 142 Cal.App.3d 1063, 1067 [191 Cal.Rptr. 436], Division Four of this appellate district concluded that the section 845 immunity applied to allegations that public transit officials knew of the danger of crime on buses but failed to provide "adequate police protection . . . ." In *Stone* v. *State of California* (1980) 106 Cal.App.3d 924, 926-927 [165 Cal.Rptr. 339], the Third District Court of Appeal held that the section 845 immunity applied to the failure to provide adequate security at the front gate of a state fairgrounds. Division Two of this appellate district held in *Moncur* v. *City of Los Angeles* (1977) 68 Cal.App.3d 118, 120-122 [137 Cal.Rptr. 239], that the public entity was immune from the failure to provide sufficient police patrols in an airport terminal area where a bomb exploded. In *Slapin* v. *Los Angeles International Airport* (1976) 65 Cal.App.3d 484, 486-487 [135 Cal.Rptr. 296], the plaintiff alleged the public entity, with knowledge that the parking area was unsafe, failed to properly secure the area. This court held: "To the extent that the first amended complaint seeks recovery for failure of the city to provide sufficient patrolling or police protection at the parking lot, it fails to state a cause of action. A public entity is specifically immunized from liability for such failure by . . . section 845." (*Id.* at p. 487, fn. omitted.) In *Hartzler* v. *City of San Jose* (1975) 46 Cal.App.3d 6, 8 [120 Cal.Rptr. 5], the decedent telephoned the police and said her estranged husband "had called her, saying that he was coming to her residence to kill her." The estranged husband had previously been arrested for assaulting the decedent. The police had been summoned to her home at least 20 times in the preceding year in connection with domestic violence perpetrated by the husband. Police officers were deliberately not dispatched to the decedent's residence and she was murdered by her estranged husband. The Court of Appeal for Division Four of the First Appellate District held: "The [wrongful death] claim is barred by the provisions of the California Tort Claims Act [citation], particularly section 845 . . . ." (*Ibid.*) In *Antique Arts Corp.* v. *City of Torrance* (1974) 39 Cal.App.3d 588, 589-590 [114 Cal.Rptr. 332], a police dispatcher, with knowledge that a robbery was in progress, delayed in sending officers to a retail outlet. As a result, the robbers escaped. Our colleagues in Division Two of this appellate district held: "The statutory scheme employed makes it

clear that failure to provide adequate police protection will not result in governmental liability [citation], nor will a public entity be liable for failure to arrest a person who is violating the law. [Citations.] The statutory scheme shows legislative intent to immunize the police function from tort liability from the inception of its exercise to the point of arrest, regardless of whether the action be labeled 'discretionary' or 'ministerial.'" (*Id.* at pp. 592-593.) As can be noted, none of these cases involves a riot situation such as existed in *Susman* nor a specific legislative intention to eliminate civic tort liability for property damage committed by a mob as was provided for in former section 50140; nonetheless, they are pertinent and persuasive authority, and are fully consistent with *Susman,* as to why section 845 immunizes defendants in this case.

We recognize that some courts have held that the individual negligence of on-scene officers in performing law enforcement functions such as moving a police cruiser or laying out a warning flare pattern are outside the scope of the section 845 immunity from money damages. (*Mann* v. *State of California* (1977) 70 Cal.App.3d 773, 777-781 [139 Cal.Rptr. 82].) The present case is far different than the scenario described in *Mann.* Defendants in the present case are senior officials in the police department. They are alleged to have made unlawfully discriminatory policy decisions as to the allocation of police resources in the second largest city in the country in the midst of a riot. That is the kind of political decision by policymaking officials section 845 was designed to cover. (Cf. *Wallace* v. *City of Los Angeles* (1993) 12 Cal.App.4th 1385, 1402 [16 Cal.Rptr.2d 113].) Section 845 applies to "'political decisions which are involved in . . . deploying a police force.'" (*Lopez* v. *Southern Cal. Rapid Transit Dist., supra,* 40 Cal. 3d at p. 792.)

█ Section 845 is an absolute immunity from the duty to pay monetary damages when by its terms it applies to a discretionary policy determination concerning police deployment. Absolute immunities apply to both ministerial and discretionary acts. (*Kisbey* v. *State of California* (1984) 36 Cal.3d 415, 418-419 [204 Cal.Rptr. 428, 682 P.2d 1093]; *County of Sacramento* v. *Superior Court* (1972) 8 Cal.3d 479, 481-484 [105 Cal.Rptr. 374, 503 P.2d 1382].) Absolute immunity from the duty to pay tort damages has been recognized in the following situations: failure of the police to properly detain a motorist who escapes and thereafter causes injury (*Kisbey* v. *State of California, supra,* 36 Cal.3d at pp. 417-419 [§ 845.8]); failure of the county to properly maintain a jail which resulted in the escape of a prisoner and the ensuing shooting of a burglary victim (*County of Sacramento* v. *Superior Court, supra,* 8 Cal.3d at pp. 481-485 [§ 845.8]); failure of police officers to disclose exculpatory evidence thereby resulting in the conviction of an innocent accused (*Randle* v. *City and County of San Francisco* (1986) 186

Cal.App.3d 449, 452-453, 456-457 [230 Cal.Rptr. 901] [§ 821.6]); child rendered a paraplegic when he fell from a rope on a tree on public property (*Kuykendall* v. *State of California* (1986) 178 Cal.App.3d 563, 565 [223 Cal.Rptr. 763] [§ 831.2]); and spraying of pesticide on populated areas. (*Farmers Ins. Exchange* v. *State of California* (1985) 175 Cal.App.3d 494, 504-505 [221 Cal.Rptr. 225] [§ 8655].) Each of the foregoing cases emphasizes the impact of an absolute immunity from the payment of monetary damages. The Legislature has made certain policy decisions concerning various activities of public entities and their employees. Once a particular form of conduct falls within the scope of the entity, no right to recover damages exists for those actions.

The present case involves injuries arising from the "failure to provide sufficient police protection services." (§ 845.) ■ Plaintiffs argue this is a discrimination case outside the ambit of section 845. However, as noted previously, the gravamen of the first amended complaints is that the police were not present at the intersection. The only reason plaintiffs were injured was that no police were present. The unlawful motive for the failure to deploy an adequate number of officers, intentional discrimination, does not change the injury causing event, a "failure to provide sufficient police protection services." (§ 845.) Given the fact governmental tort immunities from damages apply to intentional torts (see page 510, *post.*) defendants' alleged unlawful discriminatory motive does not take plaintiffs' state law claims outside the scope of section 845.

E. *The Effect of the Unruh Civil Rights Act on the Section 845 Immunity From Money Damages*

1. *Introduction*

■ Plaintiffs argue that the section 845 immunity from paying money damages does not apply to their Unruh Civil Rights Act claims. They contend that even if defendants would be immune from the payment of monetary damages for failure to provide sufficient police protection, the Unruh Civil Rights Act supersedes the statutory immunity. We reject this contention for two reasons. First, the immunity is a jurisdictional bar to pursuing any claim for money damages against public employees. Second, there is no evidence that the Legislature ever intended before or after *Muskopf* to obviate the immunity for a public employee failing to enforce the law or to provide adequate police protection in terms of deployment of officers in a riot situation and therefore vest California courts with jurisdiction to hear such claims for monetary relief.

## 2. *Jurisdictional Effect of a Governmental Immunity*

Both before and after *Muskopf,* governmental immunities from claims seeking monetary relief have been interpreted by the Supreme Court and the Courts of Appeal to be jurisdictional in nature. Prior to *Muskopf,* the California Supreme Court held that sovereign immunity was a jurisdictional bar to suit. (*Yarrow* v. *State of California* (1960) 53 Cal.2d 427, 433, fn. 4 [2 Cal.Rptr. 137, 348 P.2d 687] [negligent vehicle operation not subject to sovereign immunity because of specific statutory enactment]; *Harden* v. *Superior Court* (1955) 44 Cal.2d 630, 637 [284 P.2d 9] [no statute authorizes eminent domain powers outside city limits]; *People* v. *Superior Court* (1947) 29 Cal.2d 754, 756 [178 P.2d 1, 40 A.L.R.2d 919] ["[t]he defense of sovereign immunity from suit presents a jurisdictional question . . ."].) After *Muskopf* and the adoption of the Tort Claims Act, the Supreme Court reached the same conclusion. (*E. L. White, Inc.* v. *City of Huntington Beach* (1978) 21 Cal.3d 497, 510-512, fn. 10 [146 Cal.Rptr. 614, 579 P.2d 505] [§ 835 immunity for liability "[e]xcept as otherwise provided by statute" does not extend to implied indemnity claim]; *County of Sacramento* v. *Superior Court, supra,* 8 Cal.3d at p. 481 [scope of § 845.8 immunity against liability for escaped prisoner's criminal conduct presents jurisdictional issue].) The Courts of Appeal have likewise held in varying contexts that a governmental immunity is a jurisdictional bar to a claim for money damages against a public entity or employee. (*Hooper* v. *City of Chula Vista* (1989) 212 Cal.App.3d 442, 454, fn. 11 [260 Cal.Rptr. 495] [§ 845.8 immunity from liability for injury caused by an escaping prisoner is a jurisdictional matter which can be raised for the first time on appeal even if the question "was not adequately asserted in the trial court."]; *Kemmerer* v. *County of Fresno* (1988) 200 Cal.App.3d 1426, 1435 [246 Cal.Rptr. 609] [§§ 820.2 and 821.6 immunities raise jurisdictional issues which may be raised for the first time on appeal]; *State of California* v. *Superior Court* (1984) 150 Cal.App.3d 848, 853-858 [197 Cal.Rptr. 914] [§ 815 immunity from liability applies to failure of Department of Real Estate to conduct an investigation]; *Buford* v. *State of California* (1980) 104 Cal.App.3d 811, 826-827 [164 Cal.Rptr. 264] [§ 854.8 immunity from liability for conduct by escapee of mental institution raises an issue of the court's jurisdiction]; *County of Santa Barbara* v. *Superior Court* (1971) 15 Cal.App.3d 751, 754 [93 Cal.Rptr. 406] [§§ 845.8 and 846 immunities from liability for injuries caused by an escaped prisoner and the failure to make an arrest respectively are jurisdictional issues]; *State of California* v. *Superior Court* (1968) 263 Cal.App.2d 396, 398-400 [69 Cal.Rptr. 683] [§ 835, subd. (b) immunity requiring actual or constructive notice of defective condition raises a jurisdictional question]; *Gould* v. *Executive Power of the State* (1952) 112 Cal.App.2d 890, 891 [247 P.2d 424] [sovereign immunity from suit presents a jurisdictional question]; see Boone,

*Prohibition: Use of the Writ of Restraint in California* (1963) 15 Hastings L.J. 161, 172; 2 Witkin, Cal. Procedure (3d ed. 1985) Jurisdiction, § 67, pp. 434-435.)

### 3. *Absence of Unruh Civil Rights Act Intent to Override Section 845 Immunity From the Payment of Money Damages*

██ Normally, under the Tort Claims Act, immunities from the obligation to provide monetary compensation supersede statutory liability. It is generally recognized that a statutory governmental immunity overrides a statute imposing liability. (§ 815, subd. (b).) The Law Revision Commission Comment to section 815 states in pertinent part: "In the following portions of this division, there also are many sections granting public entities and public employees broad immunities from liability. In general, the statutes imposing liability are cumulative in nature, *i.e.*, if liability cannot be established under the requirements of one section, liability will nevertheless exist if liability can be established under the provisions of another section. On the other hand, under subdivision (b) of this section, the immunity provisions will as a general rule prevail over all sections imposing liability." (4 Cal. Law Revision Com. Rep. (Jan. 1963) pp. 837-838.) Other commentators are in agreement that the Tort Claims Act immunities apply to liabilities established by other statutes. (Cal. Government Tort Liability Practice (Cont.Ed.Bar 1992) § 2.15, pp. 83-84; 35 Cal.Jur.3d, Government Tort Liability, § 3, pp. 15-16; Van Alstyne, Cal. Government Tort Liability Practice (Cont.Ed.Bar 1980) § 2.28, pp. 70-71.) Stated differently, the general rule is that the governmental immunity will override a liability created by a statute outside of the Tort Claims Act. Further, unless an immunity otherwise provides, the governmental tort immunities apply to intentional tortious conduct. (*Sullivan* v. *County of Los Angeles* (1974) 12 Cal.3d 710, 720 [117 Cal.Rptr. 241, 527 P.2d 865]; *Taylor* v. *Mitzel* (1978) 82 Cal.App.3d 665, 673 [147 Cal.Rptr. 323]; *Schonfeld* v. *City of Vallejo* (1975) 50 Cal.App.3d 401, 419 [123 Cal.Rptr. 669]; *Blackburn* v. *County of Los Angeles* (1974) 42 Cal.App.3d 175, 177-178 [116 Cal.Rptr. 622]; *Burgdorf* v. *Funder* (1966) 246 Cal.App.2d 443, 448-449 [54 Cal.Rptr. 805].) The causes of action at issue in this case allege intentional race discrimination.

██ The issue as to whether the section 845 immunity from the duty to pay monetary damages is applicable to an Unruh Civil Rights Act claim is one of legislative intent. First, courts which have considered the effect of Tort Claims Act immunity on legislatively adopted statutory causes of action have always characterized the question as one of legislative intent. The issue has in the past been presented as one of whether the Legislature intended the government immunity to not be subject to another statute providing for a

cause of action. For example, in *State of California* v. *Superior Court* (1974) 12 Cal.3d 237, 246 [115 Cal.Rptr. 497, 524 P.2d 1281], the plaintiff sought a writ of mandate in the trial court to set aside a zoning decision by the California Coastal Zone Conservation Commission. Pursuant to Code of Civil Procedure section 1095, the plaintiffs also sought damages resulting from the denial of a zoning permit. However, in an opinion authored by Associate Justice Mosk, the Supreme Court held that the section 818.4 and 821.2 immunities from liability for damages resulting from permit issuance decisions applied notwithstanding the right to damages granted by Code of Civil Procedure section 1095. Justice Mosk, speaking for a unanimous court, held: "It seems clear that sections 818.4 and 821.2 . . . were intended by the Legislature to qualify section 1095 of the Code of Civil Procedure. The latter provision, which was in effect for more than a century before the enactment of the immunity provisions of the Government Code in 1963 (cf. Stats. 1851, ch. 5, § 477, p. 126, with Stats. 1963, ch. 1681, § 1), merely authorizes damages in a mandamus proceeding where such damages are otherwise appropriate. The general provisions of section 1095 of the Code of Civil Procedure were not intended to prevail over the specific immunities granted by sections 818.4 and 821.2 . . . . Otherwise, those immunities would be rendered virtually inoperative since a cause of action for damages would be appropriate each time a permit was denied if the demand for damages was combined with a petition for writ of mandate to compel the issuance of the permit. The Legislature could not have intended to sanction evasion of the statutory immunity which it provided in sections 818.4 and 821.2 . . . by such a simple pleading device." (12 Cal.3d at p. 246, fn. omitted.) Other courts which have held that Tort Claims Act immunities from financial claims apply to statutorily authorized causes of action have likewise applied traditional legislative intent analysis in determining whether the public entity or employee was immune. (*Mikkelsen* v. *State of California* (1976) 59 Cal.App.3d 621, 624-630 [130 Cal.Rptr. 780] [§ 830.6 design defect immunity barred a statutory cause of action for nuisance based upon Civ. Code, § 3479]; *O'Hagan* v. *Board of Zoning Adjustment* (1974) 38 Cal.App.3d 722, 731 [113 Cal.Rptr. 501] [as in *State of California* v. *Superior Court, supra,* 12 Cal.3d at p. 246, §§ 818.4 and 821.2 immunities take precedence over Code Civ. Proc., § 1095 right to damages against a public entity].)

Similarly, in connection with the effect of other statutes on the Unruh Civil Rights Act, our Supreme Court has premised its conclusions on legislative intent analysis. In *Schmidt* v. *Superior Court* (1989) 48 Cal.3d 370, 383 [256 Cal.Rptr. 750, 769 P.2d 932], an opinion authored by Associate Justice Arguelles, our Supreme Court held that the Legislature, in enacting the Unruh Civil Rights Act, did not intend to overrule the provisions of Civil Code section 798.76 which permitted age discrimination in

mobilehome park leasing. The court held: "Both the Mobilehome Residency Law and the Unruh Act are, however, statutory enactments of equal legislative dignity, and while the Unruh Act unquestionably embodies a fundamental public policy in this state, the Unruh Act does not, by virtue of the importance of its general policy alone, necessarily prevail over other inconsistent statutes. The Legislature is free, of course, to repeal section 798.76 in whole or in part, or to subordinate the provisions of section 798.6 to any other legislation, including the Unruh Act. But the decision whether the broad policy of the Unruh Act should supersede the provisions of [section] 798.76 is a matter of legislative, not judicial, prerogative. Our inquiry must be whether the Legislature has decreed that the provisions of the Unruh Act are to displace section 798.6. As we shall see, the Legislature clearly has not done so." (48 Cal.3d at pp. 382-383.)

Pursuant to the reasoning of the foregoing authority, we have carefully reviewed extensive legislative history materials for Civil Code sections 51.7 and 52 which serve as the basis of plaintiffs' fifth and sixth causes of action respectively in their first amended complaints. There is no indication either in the express wording of those statutes or their legislative history that the Legislature ever contemplated the effect of the section 845 immunity which excuses the payment of money damages for the failure to provide adequate police services. Civil Code section 51.7 was initially adopted in 1976. (Stats. 1976, ch. 1293, § 2, p. 5778.) Also, nothing in the language or legislative history of the 1976 enactment or its 1987, 1985, 1984, amendments suggests the Tort Claims Act immunities are to be inapplicable to a cause of action premised upon Civil Code section 51.7. (Stats. 1987, ch. 1277, § 2, p. 4544; Stats. 1985, ch. 497, § 1, p. 1850; Stats. 1984, ch. 1437, § 1, p. 5037.)

Further, there is no evidence that the Legislature in originally enacting Civil Code section 52 or amending it repeatedly ever sought to address the question of public entity and employee immunity from the duty to pay money claims arising from the failure to enforce the law or provide adequate police protection. Prior to *Muskopf*'s rejection of the blanket rule of sovereign immunity, there was no liability for failing to enforce the law or provide adequate police protection, other than under the circumstances specified in former section 50140 et seq. which involved public entity responsibility for property damage arising from a riot. Rather, as explained earlier, the failure to enforce the law or make an arrest was the exercise of a governmental power, which prior to *Muskopf*, was subject to the sovereign immunity doctrine. (*Tomlinson* v. *Pierce, supra,* 178 Cal.App.2d at pp. 115-116; *Shipley* v. *City of Arroyo Grande, supra,* 92 Cal.App.2d at p. 751; *Campbell* v. *City of Santa Monica, supra,* 51 Cal.App.2d at p. 629; see *Rubinow* v. *County of San Bernardino, supra,* 169 Cal.App.2d at p. 70; Study Relating to

Sovereign Immunity (Jan. 1963) 5 Cal. Law Revision Com. Rep. (1963) pp. 443-452; Recommendations Relating to Sovereign Immunity, No. 1, Tort Liability of Public Entities and Public Employees (Jan. 1963) 4 Cal. Law Revision Com. Rep. (1963) p. 844.) In terms of the provisions of Civil Code section 52 which were in effect prior to the 1963 adoption of the Tort Claims Act, we have not been provided with any legislative history or statutory language which indicates an intention on the part of the Legislature to modify the sovereign immunity doctrine which relates to the failure to provide adequate police protection. As to the post-1963 amendments to Civil Code section 52, none of them have reflected a legislative intention to abrogate the section 845 immunity from money damages. (Stats. 1992, ch. 913; Stats. 1991, ch. 839; Stats. 1991, ch. 607; Stats. 1989, ch. 459, § 1, pp. 1656-1657; Stats. 1987, ch. 159, § 4, pp. 1095-1097; Stats. 1986, ch. 244, § 1, pp. 1204-1205; Stats. 1981, ch. 521, § 1, pp. 1880-1881; Stats. 1978, ch. 1212, § 1, pp. 3927-3928; Stats. 1976, ch. 1293, § 2.5, pp. 5778-5779; Stats. 1974, ch. 1193, § 2, p. 2568.) Simply stated, after the 1963 adoption of section 845, the Legislature never determined that immunity from potential monetary damage liability was to be inapplicable to Civil Code section 52. Accordingly, just as in *Schmidt* v. *Superior Court, supra,* 48 Cal.3d at page 383, where our Supreme Court concluded the Unruh Act did not override the provisions of Civil Code section 798.76; in the present case, the Legislature has clearly not decreed that the provisions of the Unruh Act are to displace section 845.

In summary, the section 845 immunity from possible damage liability is jurisdictional. Normally, governmental immunities apply to statutes outside the Tort Claims Act which provide for liability. Further, we have read 117 legislative committee and caucus reports prepared since 1963 relating to Civil Code sections 51.7 and 52. Nothing in those 117 reports suggests that any damage immunity in the Tort Claims Act is inapplicable to an Unruh Civil Rights Act claim. More specifically, section 845 is never alluded to, directly or indirectly in those reports. Plaintiffs have failed to demonstrate that Civil Code sections 51.7 and 52 were intended to override the immunity and vest courts with jurisdiction to hear claims for money damages involving the failure to "provide sufficient police protection service." (§ 845.)

### 4. *The Application of Section 845 Does Not Violate Plaintiffs' Equal Protection Rights*

Plaintiffs contend that even if section 845 may be statutorily applicable to their Unruh Civil Rights Act claims, it is violative of their

equal protection rights to have the immunity prevent them from financially recovering because of defendants' unlawfully discriminatory conduct in allocating police resources in the intersection and in surrounding minority communities. Contrary to plaintiffs' contention, the present application of the section 845 immunity from damages violates no equal protection rights. Section 845, pursuant to the Legislature's intent, creates a statutory classification which bars recovery for all persons, regardless of their nationality or race, who wish to sue a public entity or employee for failing "to provide sufficient police protection service" during a riot. Section 845 does not provide any direction to any law enforcement agency as to how to allocate police services; it acts in the present case to prevent financial recovery "for failure to provide sufficient police protection service." (§ 845.) The immunity from damages treats all claimants the same, regardless of race or nationality. Section 845 makes no classification premised upon the race or nationality of a plaintiff in a suit against a public entity or employee. Therefore, equal protection decisions interpreting race or nationality based discriminatory statutes have no application in this case. (E.g., *McGlaughlin* v. *Florida* (1964) 379 U.S. 184, 188 [13 L.Ed.2d 222, 226, 85 S.Ct. 283] [Florida statute criminalizing conduct of interracial couple but not same activities by two persons of the same race violative of equal protection].)

Moreover, we have been presented no evidence section 845 is a statute which is neutral in its wording but "grossly discriminatory in its operation" which would give rise to heightened equal protection analysis. (E.g., *American Motorist Ins. Co.* v. *Starnes* (1976) 425 U.S. 637, 645 [48 L.Ed.2d 263, 271, 96 S.Ct. 1800]; *Williams* v. *Illinois* (1970) 399 U.S. 235, 242 [26 L.Ed.2d 586, 598-594, 90 S.Ct. 2018].) ▮▮ ▮▮ Therefore, we must apply the rational basis equal protection test articulated by the United States Supreme Court in *G.D. Searle & Co.* v. *Cohn* (1982) 455 U.S. 404, 408 [71 L.Ed.2d 250, 255-256, 102 S.Ct. 1137], which states: "In the absence of a classification that is inherently invidious or that impinges upon fundamental rights, a state statute is to be upheld against equal protection attack if it is rationally related to the achievement of legitimate governmental ends." (Accord, *Whitfield* v. *Roth* (1974) 10 Cal.3d 874, 889-890 [112 Cal.Rptr. 540, 519 P.2d 588]; *Bonds* v. *State of California* ex rel. *Cal. Highway Patrol* (1982) 138 Cal.App.3d 314, 322 [187 Cal.Rptr. 792]; *Stanley* v. *City and County of San Francisco* (1975) 48 Cal.App.3d 575, 580-582 [121 Cal.Rptr. 842].) The United States Supreme Court has repeatedly applied the rational basis test to statutes affecting the right to participate in civil litigation. (*G.D. Searle & Co.* v. *Cohn, supra,* 455 U.S. at pp. 408-412 [71 L.Ed.2d at pp. 256-258] [statute of limitation tolling provision did not involve a fundamental right and was not subject to heightened equal protection analysis]; *Ortwein* v. *Schwab* (1973) 410 U.S 656, 660 [35 L.Ed.2d 572, 576, 93 S.Ct.

1172] [filing fee requirement for appeal which discriminated against the indigent subject to rational justification standard of equal protection review]; *United States* v. *Kras* (1973) 409 U.S. 434, 445 [34 L.Ed.2d 626, 635-639, 98 S.Ct. 631] [indigent's ability to secure discharge from bankruptcy implicated no "fundamental interest"]; *Lindsey* v. *Normet* (1972) 405 U.S. 56, 69-79 [31 L.Ed.2d 36, 48-54, 92 S.Ct. 862] [neutrally drawn Oregon unlawful detainer statute was subject to rational basis test and did not violate equal protection rights because it required prompt trial and narrowly limited the available defenses; although double bond requirement in the event of an appeal unlawfully discriminated against indigents].) Further, the United States Supreme Court has noted that a state does not violate Fourteenth Amendment due process rights by creating an absolute immunity in tort litigation. (*Martinez* v. *California* (1980) 444 U.S. 277, 280-283 [62 L.Ed.2d 481, 486-488, 100 S.Ct. 553] [section 845.8, subdivision (a) immunity for paroling a California prisoner did not violate due process]; accord, *Logan* v. *Zimmerman Brush Co.* (1982) 455 U.S. 422, 433 [71 L.Ed.2d 265, 276, 102 S.Ct. 1148].) Moreover, the United States Supreme Court has held that the denial of judicial relief is insufficient to transform a private deprivation of property into state action for Fourteenth Amendment purposes. (*Flagg Bros., Inc.* v. *Brooks* (1978) 436 U.S. 149, 165 [56 L.Ed.2d 185, 199, 98 S.Ct. 1729].)

We now turn to the question of whether section 845 violates the equal protection clause and the related provisions of the state Constitution because it is not supported by a rational basis. Obviously, section 845 meets the constitutional test. It is a neutrally drawn statute which has no race or nationality based distinctions. Further, the Law Revision Commission and the Legislature could legitimately conclude, as they did that: "public officials charged with [the law enforcement] function will remain politically responsible only if the desirability of . . . enforcing particular laws is not subject to court review through the device of deciding tort actions"; public "officials must be free to determine these questions without fear of liability either for themselves . . . if they are to be politically responsible for these decisions."; the "remedy for officials . . . who do not adequately enforce existing law . . . is to replace them with other officials"; to hold otherwise would create "potential governmental liability for all . . . crimes"; and the "better public policy [is] to leave the injured person to his [or her] remedy against the person actually causing the injury than it is to impose an additional liability on the government . . . ." (Recommendation Relating to Sovereign Immunity, No. 1, Tort Liability of Public Entities and Public Employees (Jan. 1963) 4 Cal. Law Revision Com. Rep. (1963) pp. 817-818.) Further, the Legislature could reasonably conclude that decisions in a riot context concerning the level of police protection to be provided "are particularly difficult to make in the face of an unexpected public calamity."

(*Susman* v. *City of Los Angeles, supra,* 269 Cal.App.2d at p. 821.) Finally, the Legislature reasonably could have determined that to provide public employee or entity liability would constitute a potentially impermissively heavy financial burden on police supervisors and the public entities which employ them, particularly in a riot situation. We cannot conclude that the Legislature's determination to provide an immunity in a riot situation for the failure to provide adequate police protective services is irrational. Accordingly, plaintiffs' equal protection claims concerning the application of section 845 are without merit.[7]

F. *Plaintiffs Have no Right to Sue for Damages Under the Equal Protection Provisions of the California Constitution*

 Plaintiffs argue that the section 845 immunity is inapplicable because, as a statute, it cannot contravene or otherwise limit their state constitutional equal protection rights to recover damages for personal injuries. They reason there is a right, apart from statute, to sue for personal injury damages under the equal protection provisions of article I, section 7, subdivision (a) of the California Constitution[8] which provides in pertinent part: "A person may not be . . . denied equal protection of the laws . . . ." However, we determine plaintiffs may not sue for personal injury damages under article I, section 7, subdivision (a) for a violation of their equal protection rights.[9]

---

[7]Still pending are plaintiffs' federal civil rights causes of action. We quite obviously do not state or imply section 845 bars those claims. (*Martinez* v. *California, supra,* 444 U.S. 277, 284, fn. 8 [62 L.Ed.2d 481, 488].)

[8]Unless otherwise indicated, all future references to the Constitution are to that document in its present format. The version of that document adopted by the voters in 1849 will be referred to as the Constitution of 1849. The document adopted in 1879 shall be referred to as the Constitution of 1879.

[9]The parties have briefed the effect of article III, section 5 on the present case. We need not address the question of whether section 845 is, as applied to plaintiffs' equal protection claims, a constitutionally valid immunity from damages because article III, section 5 which states, "Suits may be brought against the state in such manner and in such courts as shall be directed by law" is a delegation of power to the Legislature to enact immunities such as are found in the Tort Claims Act. In other words, we do not discuss the issue as to whether, even if article I, section 7, subdivision (a) provides for a right to recover personal injury damages, the section 845 immunity would apply because article III, section 5 specifically permits legislative promulgation of immunities that apply to all suits brought against public employees, including those for tort damages brought under terms of the California Constitution. Despite its reference to suits against the "state," article III, section 5 applies to all suits even those against local agencies and their employees. (*Edgington* v. *County of San Diego* (1981) 118 Cal.App.3d 39, 42-43 [173 Cal.Rptr. 225]; *Smith* v. *City and County of San Francisco* (1977) 68 Cal.App.3d 227, 230 [137 Cal.Rptr. 146].) Article III, section 5 is an enabling provision which allows the Legislature to comprehensively regulate "suits" against the state, local governmental agencies, and public employees. Courts are in accord that article III,

The California Supreme Court has permitted the imposition of damages for a violation of a provision of the California Constitution when the voters

---

section 5 constitutes the constitutional basis for the Tort Claims Act, which quite obviously includes section 845. In *Rose* v. *State of California* (1942) 19 Cal.2d 713, 723 [123 P.2d 505], the Supreme Court held that former article XX, section 6 of the Constitution of 1879, now article III, section 5, was "intended to be permissive, that is, to enable the [L]egislature to specify what suits, other than those already provided for, might be brought against the state . . . ." Similarly, in *Flournoy* v. *State of California* (1964) 230 Cal.App.2d 520, 525 [41 Cal.Rptr. 190], the Court of Appeal held: "Indeed, it would seem almost an absurdity to argue that the Legislature, within its regulatory police powers, can change common law rules prospectively affecting *private* litigants but cannot do so when a governmental entity is involved. This would be particularly strange in the retrospective view of the long history of governmental-liability-case-law wherein the power of legislatures so to act has not only been asserted repeatedly but such power (before *Muskopf*) has been sometimes said to be *exclusive*. . . . . [A]lthough governmental immunity as a matter of substantive law was originally court-made and therefore could be (and was) court-unmade, the Legislature still had procedural control in granting and withholding consent to suit. The California Constitution (art. XX, § 6) [now art. III, § 5] expressly grants such control to the Legislature." (Original italics.) Other courts are in agreement that provisions of the Tort Claims Act were adopted under the authority of article III, section 5. (*Gehman* v. *Superior Court* (1979) 96 Cal.App.3d 257, 262 [158 Cal.Rptr. 62] [art. III, § 5 allows Legislature to determine what actions are exempt from the claims requirement]; *Chase* v. *State of California* (1977) 67 Cal.App.3d 808, 811 [136 Cal.Rptr. 833] [Tort Claims Act "enacted in implementation" of art. III, § 5], disapproved on another point in *People* ex rel. *Department of Transportation* v. *Superior Court* (1980) 26 Cal.3d 744, 754, fn. 5 86[163 Cal.Rptr. 585, 608 P.2d 673]; see *Edgington* v. *County of San Diego, supra,* 118 Cal.App.3d at pp. 42-43 [statute of limitations in Tort Claims Act adopted under authority of art. III, § 5]; *Harland* v. *State of California, supra,* 99 Cal.App.3d 839, 845 [art. III, § 5 empowered "the Legislature to impose conditions, such as the filing of a claim within a specified period, as a prerequisite to commencement of an action . . . ."]; *Smith* v. *City and County of San Francisco, supra,* 68 Cal.App.3d at p. 230 [adoption of reasonable rules in the Tort Claims Act pursuant to art. III, § 5 allowed for disparate treatment of plaintiffs]; *Carr* v. *State of California* (1976) 58 Cal.App.3d 139, 143 [129 Cal.Rptr. 730] [art. III, § 5 granted the state the authority to "place limitations upon" a cause of action as was done by the Tort Claims Act]; *Tehachapi-Cummings County Water Dist.* v. *Armstrong* (1975) 49 Cal.App.3d 992, 999 [122 Cal.Rptr. 918] [§ 814 constituted a legislative consent to suit under the authority of art. III, § 5 in injunctive relief cases]; *Stanley* v. *City and County of San Francisco* (1975) 48 Cal.App.3d 575, 579 [121 Cal.Rptr. 842] [art. III, § 5 placed a limitation on a plaintiffs' "enforcement" of a cause of action against the state]; accord, *Lattin* v. *Franchise Tax Board* (1977) 75 Cal.App.3d 377, 380 [142 Cal.Rptr. 130] [authority of claims procedure set forth in Revenue & Taxation Code found in art. III, § 5], disapproved on another point in *Woolsey* v. *State of California* (1992) 3 Cal.4th 758, 792 [13 Cal.Rptr.2d 30, 838 P.2d 758]; *Dillon* v. *San Diego Unified Port Dist.* (1972) 27 Cal.App.3d 296, 307 [103 Cal.Rptr. 765] [statute of limitations and joinder requirements of Pub. Resources Code, §§ 6308 and 6463 authorized by art. III, § 5]; *Chas. L. Harney, Inc.* v. *State of California* (1963) 217 Cal.App.2d 77, 90 [31 Cal.Rptr. 524] [pre-*Muskopf* claim statute enacted under authority of former art. XX § 6]; *Wadley* v. *County of Los Angeles* (1962) 205 Cal.App.2d 668, 670 [23 Cal.Rptr. 154] [pre-Tort Claims Act statute of limitations for filing a claim adopted pursuant to former art. XX, § 6; *Hayashi* v. *Alameda County Flood Control* (1959) 167 Cal.App.2d 584, 586-587 [334 P.2d 1048] [pre-*Muskopf* liability statute enacted under the authority of former art. XX, § 6 applied to a local flood control district]; *County of L. A.* v. *State Dept. Pub. Health* (1958) 158 Cal.App.2d 425, 441-442 [322 P.2d 968] [mandamus

have intended such. ▮▮▮ In construing the California Constitution we are required to effectuate the voters' intent. This is because the Constitution " 'owes its whole force and authority to its ratification by the people . . . .' " (*Miller* v. *Dunn* (1887) 72 Cal. 462, 465 [14 P. 27], accord, *Turlock Irr. Dist.* v. *White* (1921) 186 Cal. 183, 186 [198 P. 1060, 17 A.L.R. 72], disapproved on another point in *Rock Creek etc. Dist.* v. *County of Calareras* (1946) 29 Cal.2d 7, 9 [172 P.2d 863].) The California Supreme Court has consistently required that the Constitution be interpreted so as to give effect to the voters' intentions. (*Bowens* v. *Superior Court* (1991) 1 Cal.4th 36, 47 [2 Cal.Rptr.2d 376, 820 P.2d 600] [art. I, § 14.1]; *Delaney* v. *Superior Court*, *supra*, 50 Cal.3d at p. 799 [art. I, § 2, subd. (b)]; *Mutual Life Ins. Co.* v. *City of Los Angeles* (1990) 50 Cal.3d 402, 406-407 [267 Cal.Rptr. 589, 787 P.2d 996] [art. XIII, § 28, subd. (f)]; *Lungren* v. *Deukmejian, supra*, 45 Cal.3d at p. 735 [art. V, § 5, subd. (b)]; *In re Lance W.* (1985) 37 Cal.3d 873, 889 [210 Cal.Rptr. 631, 694 P.2d 744] [art. I, § 28, subd. (d)]; *Board of Supervisors* v. *Lonergan* (1980) 27 Cal.3d 855, 863 [167 Cal.Rptr. 820, 616 P.2d 802] [art. XIII, § 12, art. XIII A, § 1]; *Kaiser* v. *Hopkins* (1936) 6 Cal.2d 537, 538 [58 P.2d 1278] [Cal. Const. of 1879, art. XIII, § 1 1/4]; *Miller* v. *Dunn, supra*, 72 Cal. at p. 465 [Cal. Const. of 1879, art. IV, § 32].)

▮▮▮ Applying this well-established rule of law articulated by the California Supreme Court, we conclude there is no evidence of any intent on the part of the voters to permit the recovery of personal injury damages as a result of a violation of the equal protection provisions of the California Constitution. Two lines of cases explain how the California Supreme Court

proceeding outside the scope of immunity provided by former art. XX, § 6]; *People* v. *Birch Securities Co.* (1948) 86 Cal.App.2d 703, 712 [196 P.2d 143] [federal court injunction not entitled to res judicata effect because statute adopted pursuant to authority of former art. XX, § 6 prohibited suits to enjoin state tax collection]; *Yasunaga* v. *Stockburger* (1941) 43 Cal.App.2d 396, 400-401 [111 P.2d 34] [pre-*Muskopf* claims statute adopted pursuant to former art. XX, § 6]; pre-Tort Reform Act statute of limitations enforceable under authority of former art. XX, § 6]; *Brandt* v. *Riley* (1934) 139 Cal.App. 250, 254 [33 P.2d 845] [statutory requirement that refund suit can only occur if taxes are paid under protest constitutional because of former art. XX, § 6]; *Bekins V. & S. Co.* v. *State of California* (1933) 135 Cal.App. 738, 741 [28 P.2d 61] [claims requirement in tax refund case premised on former art. XX, § 6].) Further, scholarly commentators have recognized that the Tort Reform Act was enacted under the constitutional authority of article III, section 5. (Grodin, The California State Constitution (1993) p. 79.) The United States Supreme Court has held that article III, section 5 prevented the State of California from being sued for a violation of a federal law. The United Sates Supreme Court held that article III, section 5 authorized the state to waive its immunity from suit under federal law as guaranteed by the Eleventh Amendment of the United States Constitution. The high court concluded that because our Legislature had never waived its Eleventh Amendment immunity as permitted by article III, section 5, any suit against the State of California for damages was barred under federal law. (*Atascadero State Hospital* v. *Scanlon* (1985) 473 U.S. 234, 241 [87 L.Ed.2d 171, 179, 105 S.Ct. 3142].) However, because we have concluded there is no right to recover personal injury damages under the equal protection provisions of the California Constitution, we need not discuss the effect of article III section 5 on the section 845 immunity in the present case.

has determined that a constitutional provision gives rise to a right to sue for damages. For example, in *White* v. *Davis* (1975) 13 Cal.3d 757, 775 [120 Cal.Rptr. 94, 533 P.2d 222], the California Supreme Court held that the 1972 addition to the state Constitution of the right of privacy was intended to permit suits for money damages. The Supreme Court reached this conclusion by reviewing the ballot statement submitted to the voters. (*Ibid.*) Similarly, the California Supreme Court has held that the opportunity to sue for inverse condemnation as set forth in the California Constitution included the right to sue for damages. (*Holtz* v. *Superior Court* (1970) 3 Cal.3d 296, 302 [90 Cal.Rptr. 345, 475 P.2d 441]; *Rose* v. *State of California, supra,* 19 Cal.2d at p. 720.) In reaching this conclusion, the California Supreme Court focused on the language of former article I, section 14 of the Constitution of 1879 which explicitly referred to: the right to "just compensation"; the payment of such compensation "into [c]ourt for the owner"; the ascertainment of compensation "by a jury"; the possibility a jury may be "waived"; commencing "eminent domain proceedings according to law in a court of competent jurisdiction"; permitting the court to determine the amount of monies to be deposited as a security; and "damages." Quite obviously, the express language of former article I, section 14 of the Constitution of 1879 was solely consistent with the right to sue for damages in a court of law as a result of a taking of property. (*Weber* v. *County of Santa Clara* (1881) 59 Cal. 265, 266; see Cal. Government Tort Liability Practice, *supra,* § 2.97, pp. 181-182.)[10] The language of article I, section 7, subdivision (a) does not contain references to courts, compensation, or juries and the like as in former article I, section 14 of the Constitution of 1879 and the present article I, section 19. There is nothing in the language of article I, section 7, subdivision (a) which refers to monetary relief being available in any fashion at all. Accordingly, if there is a right to sue for personal injury damages, it must result from the construction of the documents actually before the voters when the equal protection provisions of the California Constitution were adopted. (*Delaney* v. *Superior Court, supra,* 50 Cal.3d at p. 801, fn. 12; *County of Los Angeles* v. *State of California* (1987) 43 Cal.3d 46, 54 [233 Cal.Rptr. 38, 729 P.2d 202]; *White* v. *Davis, supra,* 13 Cal.3d at p. 885.) As will be noted, we

---

[10]In 1974, article I, section 14 of the state Constitution of 1879 was moved to article I, section 19 and it states: "Private property may be taken or damaged for public use only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner. The Legislature may provide for possession by the condemnor following commencement of eminent domain proceedings upon deposit in court and prompt release to the owner of money determined by the court to be the probable amount of just compensation." Since the 1974 movement of the eminent domain law to article I, section 19, our Supreme Court has quite naturally continued to recognize the right to sue for damages under the state Constitution in the condemnation context and relied upon decisional authority interpreting former article I, section 14 of the California Constitution of 1879. (E.g., *Locklin* v. *City of Lafayette* (1994) 7 Cal.4th 327, 362-367 [27 Cal.Rptr.2d 613, 867 P.2d 724]; *City of San Diego* v. *Neumann* (1993) 6 Cal.4th 738, 743 [25 Cal.Rptr.2d 480, 863 P.2d 725].)

conclude that none of the documents ever presented to the voters on any occasion when the former and present equal protection provisions of the state Constitution were voted upon indicate there was an intention to grant a right to sue for personal injury damages.[11]

In 1849, the constitutional convention first proposed article I, section 11 of the Constitution of 1849 which stated, "All laws of a general nature shall have a uniform operation." California courts have construed this language to provide for equal protection rights under the state Constitution. (See *County of L.A.* v. *Southern Cal. Tel. Co.* (1948) 32 Cal.2d 378, 388-389 [196 P.2d 773]; *Builders' Supply Depot* v. *O'Connor* (1907) 150 Cal. 265, 268-269 [88 P. 982]; 8 Witkin, Summary of Cal. Law (9th ed. 1988) Constitutional Law, § 603, pp. 57-58.) The constitutional convention completed its work on October 13, 1849, and set the date for the election as November 3, 1849. (Schedule appended to Cal. Const. of 1849, art. XII, § 6.) Needless to note, there was no voters' pamphlet. However, the convention did issue a proclamation addressed "TO THE PEOPLE OF CALIFORNIA," which discussed: the importance of the fundamental nature of the document; the preservation of liberty; the state's boundaries established by the convention; the manner in which the Constitution of 1849 provided for educational institutions; the diversity of the state's population; and the importance of voting on November 3, 1849. (Browne, Rep. on the Debates in the Convention of California

---

[11]In the body of this opinion, we concluded that the voters did not intend to provide a right to sue for personal injury damages for an equal protection violation. The same analysis has been applied by our Supreme Court to the question of whether a right to damages arises from the enactment of a statute. For example, in *Dyna-Med, Inc.* v. *Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1393 [241 Cal.Rptr. 67, 743 P.2d 1323], our Supreme Court held that the Fair Employment and Housing Act did not provide for award of punitive damages by the Fair Employment and Housing Commission. Although there were other considerations, of considerable consequence to our Supreme Court was the silence of the Legislature as to whether punitive damages could be imposed by the commission. (*Ibid.*) In *Peralta Community College Dist.* v. *Fair Employment & Housing Com.* (1990) 52 Cal.3d 40, 60 [276 Cal.Rptr. 114, 801 P.2d 357], our Supreme Court reached a similar conclusion concerning the commission's authority to award noneconomic damages. In *Moradi-Shalal* v. *Fireman's Fund Ins. Companies* (1988) 46 Cal.3d 287, 296-300 [250 Cal.Rptr. 116, 758 P.2d 58], our Supreme Court held that Insurance Code section 790.03, subdivision (h) did not create a private right of action because of insurer misconduct. Our Supreme Court noted that neither the legislative analyst nor the Legislative Counsel indicated a private right of action was created by the Unfair Practices Act. (46 Cal.3d at p. 300.) Recent Court of Appeal decisions are in accord. (*Arriaga* v. *Loma Linda University* (1992) 10 Cal.App.4th 1556, 1561-1562 [13 Cal.Rptr.2d 619] [no private right of action for violation of Gov. Code, § 11135 which prohibits discriminatory denial of benefits]; *Maler* v. *Superior Court* (1990) 220 Cal.App.3d 1592, 1598 [270 Cal.Rptr. 222] [Ins. Code, § 1861.03 which makes insurance companies subject to other provisions of law does not create a right of damages pursuant to Ins. Code, § 790.03, subd. (h)]; *Siegel* v. *American Savings & Loan Assn.* (1989) 210 Cal.App.3d 953, 967 [258 Cal.Rptr. 746] [in absence of evidence Congress intended to create a private right to sue under Home Owners' Loan Act of 1933 (12 U.S.C. § 1461 et seq.), no cause of action existed].)

(1850) pp. 474-475.) Nothing in the proclamation suggested that article I, section 11 was self-executing in the sense it provided for a right to seek personal injury damages. Commentators who have chronicled the November 3, 1849, election which resulted in the adoption of the 1849 California Constitution do not suggest the availability of such compensation was an issue considered by the voters. (Coy, California's Constitution (1930) pp. 27-28; Grodin, The California State Constitution, *supra*, pp. 9-16.)

In 1878, the Legislature adopted a resolution to provide for a constitutional convention to "revise the Constitution of this State and to frame a new Constitution." (Stats. 1878, ch. 490, § 1, p. 759.) The convention first met on September 28, 1878, and concluded its work on March 3, 1879. Article I, section 11, remained unchanged in the proposed 1879 Constitution. However, article I, section 21 was added which stated: "No special privileges or immunities shall ever be granted which may not be altered, revoked, or repealed by the Legislature; nor shall any citizen, or class of citizens, be granted privileges or immunities which, upon the same terms, shall not be granted to all citizens." (Cal. Const. of 1879, art. I, § 21.) Also added was Article IV, section 25 which provided in pertinent part: "The Legislature shall not pass local or special laws in any of the following enumerated cases . . . [¶] Nineteenth—Granting to any corporation, association, or individual any special or exclusive right, privilege, or immunity . . . . [¶] Thirty-third—In all other cases where a general law can be made applicable." (Cal. Const. of 1879, art. IV, § 25.) Article I, sections 11 and 21 and article IV, section 25 of the Constitution of 1879 have been construed by the California Supreme Court to be the functional equivalent of an equal protection provision. (*County of L.A.* v. *Southern Cal. Tel. Co.*, *supra*, 32 Cal.2d at pp. 388-389.) As in 1849, the 1879 convention issued a proclamation, "To the People of the State of California." It discussed the various provisions of the proposed 1879 Constitution including: the Declaration of Rights; the right to vote; the legislative and judicial departments; education; state prisons; the organization of local government; corporations; tax matters; water rights questions; harbors; the mode of amending the new Constitution; the manner in which the Chinese would be mistreated; and several other subjects. (Constitutional Convention (Mar. 3, 1879) Daily Journal, pp. 9-17.) In connection with the Declaration of Rights, where article I, sections 11 and 21 were located, the proclamation directed at the voters did not directly or indirectly indicate that a violation of those constitutional provisions would give rise to a right to personal injury damages.[12] Further, there was nothing in the proclamation which discussed the 19th and 33d paragraphs of article IV, section 25 in terms of creating a right to recover personal injury damages

---

[12]The proclamation, while referring to the Declaration of Rights, stated as follows: "The principal changes in this article are as follows: [¶] In reference to the grand jury, it is provided that offenses heretofore required to be prosecuted by indictment may be prosecuted by

in civil litigation.[13] None of the issues raised by the voters prior to the May 7, 1879, election involved the right to personal injury damages under the provisions of the proposed Constitution of 1879 which provided for equal treatment under the law. (Coy, California's Constitution, *supra*, at p. 41; Grodin, The California State Constitution, *supra*, at p. 16.)

In 1974, Proposition 7 on the November 5, 1974, ballot presented to the voters for the third time in our state's history an opportunity to adopt a provision providing for equal protection of the laws. Article I, section 11 of the Constitution of 1879 was moved to article IV, section 16. In its place, article I, section 7, subdivision (a) was inserted which states, as it does today: "A person may not be deprived of . . . equal protection of the laws . . . ." The "Analysis by Legislative Analyst" in the voter pamphlet indicated Proposition 7: "[P]uts into the Constitution some rights which now exist in the federal Constitution . . . ." (Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 5, 1974) p. 26.) Further, the Legislative Analyst's analysis stated: "Federal Rights in State

---

information, after examination and commitment by a Magistrate. This change dispenses with the necessity of drawing and summoning a grand jury to act upon every case before a party accused can be put on trial, and will be a great saving of expense to the various counties of the State. But to guard against possible abuse or favoritism on the part of the prosecuting officer, and for the purpose of investigating the conduct of officials and supervising the management of county affairs, a grand jury is required to be drawn and summoned at least once a year in each county. The practice of prosecuting by information instead of by indictment has been adopted in several of the States, and found to work well. [¶] In respect to the trial jury, it is provided that in civil actions three-fourths of the jury may render a verdict. This change from the old common law practice has also been tried elsewhere with satisfactory results. [¶] In criminal cases not amounting to felony a jury may be waived, and in like cases, as well as in civil actions, the jury may consist of a less number than twelve if the parties so agree. [¶] The only change made in the section relating to freedom of speech and the press, is that in prosecutions for libel for publication in a newspaper the trial is required to be had in the county where the paper has its publication office, or where the party alleged to be libeled at the time resided, subject to be changed for cause. [¶] The provision limiting the exercise of the right of eminent domain has been amended so as the better to protect the rights of the citizen in the possession and enjoyment of his property. A new section has been added, declaring against monopolies, to the effect that no special privileges or immunities shall ever be granted which may not be altered, revoked, or repealed by the Legislature; nor shall any citizen or class of citizens be granted privileges or immunities which, upon the same terms, shall not be granted to all citizens." (Constitutional Convention, *supra*, Daily Journal, pp. 9-10.)

[13]The only pertinent discussion in the proclamation with respect to article IV of the Constitution of 1879 was as follows, "The power of the Legislature has been restricted in every case where it would be safe to do so, in respect to the enacting of local or special laws." (Constitutional Convention, *supra*, Daily Journal at p. 10.) The remainder of the discussion of article IV involved: the expectation of reducing the costs of operating the Legislature; requiring that bills be introduced 10 days prior to the end of a session under most circumstances; qualifications of assemblypersons and senators; daily pay and mileage for legislators; the timing of vetoes by the Governor; salaries of state officers; and other matters entirely unrelated to equal protection considerations. (*Id.* at pp. 10-11.)

Constitution. The proposition puts the following three rights into the State Constitution. These rights presently are contained in the Federal Constitution. [¶] (a) The Legislature shall make no law respecting the establishment of religion. [¶] (b) A person may not be deprived of life, liberty, or property without due process of law. [¶] (c) A person may not be denied equal protection of the laws." (*Ibid.*) As can be noted, no reference is made to personal injury damages in connection with a violation of the equal protection amendment.

However, on the same page of the voters' pamphlet, the Legislative Analyst's analysis did refer to the changes in the constitutional provision concerning eminent domain, as follows in pertinent part: "Revision of Eminent Domain Procedure. If a state or local government takes real property for public use, the owner of the property has a right to be compensated. If the owner of the property and the government disagree over the proper amount of compensation, the dispute is settled by a trial. [¶] Presently, the government may take possession of the property before the trial takes place by depositing money with the court as security for payment. The court decides how much the security deposit must be. This procedure is called 'immediate possession.' " (Ballot Pamp. Proposed Amends., *supra*, at p. 26.) As can be noted, in connection with the revisions in the eminent domain procedure, there was a specific reference to the right to compensation. As indicated earlier, no such reference is made in connection with the equal protection provision which is discussed on the same page of the voter pamphlet. Moreover, the ballot pamphlet specifically states as to Proposition 7, "Financial impact: No increase in costs." (*Ibid.*) It is noteworthy that at the time of the voter adoption of Proposition 7, no California appellate court opinion had held there was a right to sue for damages resulting from a violation of the equal protection provisions of the state Constitution. Finally, like the Legislative Analyst's analysis, nothing in the arguments for and against Proposition 7 contained in the voter pamphlet indicated there would be a right to sue for personal injury damages as a result of a violation of the right of equal protection of the laws under the state Constitution. (Ballot Pamp. Proposed Amends., *supra*, at pp. 28-29.)

Accordingly, we are confronted with the following facts. No provision of the 1849, 1879, and 1974 versions of the Declaration of Rights or related provisions in the 1879 document by their very terms granted a right to seek personal injury damages for an equal protection violation under the terms of the state Constitution. This is in contrast to article I, section 14 of the Constitution of 1879 and article I, section 19 of the present Constitution which makes specific reference to compensation. Further, nothing in the 1849 and 1878 proclamations by the constitutional conventions refers to a

right to sue for personal injury damages for an equal protection violation. Finally, the 1974 voter pamphlet: does not suggest that there would be a right to personal injury damages; makes a specific reference on the same page to the right to compensation in the eminent domain context; and states there would be no increase in governmental costs in a historical setting where no court had held there was a right to personal injury damages under the equal protection provisions of the California Constitution. Plaintiffs have cited no legislative materials which can be read to grant them the right under article I, section 7, subdivision (a) of the California Constitution to recover damages.[14]

---

[14]Our Supreme Court in *Delaney* v. *Superior Court, supra*, 50 Cal.3d at page 801, footnote 12 and *Lungren* v. *Deukmejian, supra*, 45 Cal.3d at pages 742-743 emphasized the provisions of the state Constitution are to be construed by reference to documents actually before the voters—not reports prepared by other individuals which the electorate did not see prior to voting. However, we note that there is earlier California Supreme Court authority which supports the proposition that reports prepared by the constitutional conventions or the Constitution Revision Commission committees may be admissible for purposes of construing the California Constitution. (See *California Teachers Assn.* v. *San Diego Community College Dist.* (1981) 28 Cal.3d 692, 700 [170 Cal.Rptr. 817, 621 P.2d 856]; *Stanton* v. *Panish* (1980) 28 Cal.3d 107, 114 [167 Cal.Rptr. 584, 615 P.2d 1372]; *Mosk* v. *Superior Court* (1979) 25 Cal.3d 474, 495 [159 Cal.Rptr. 494, 601 P.2d 1030].) In the body of this opinion, in compliance with the later Supreme Court authority, we have focused on the proclamations of the two constitutional conventions and the voter pamphlet materials directly available to the voters in 1974 when article I, section 7, subdivision (a) was adopted.

However, if the committee reports prepared in the constitutional drafting process may be relied upon in determining whether the equal protection provisions of our Constitution create a right to personal injury damages, we find no evidence of such an intent to provide for such relief either by the constitutional conventions or the Constitution Revision Commission. As to the 1849 convention which proposed the language concerning uniform operation of general laws (Cal. Const. of 1849, art. I, § 11), we have been unable to find any committee reports. However, there was no debate or discussion concerning the proposal to require that general laws be uniformly applied. Article I, section 11 of the 1849 Constitution was adopted without discussion. (Browne, Rep. on the Debates in the Convention of California, *supra*, pp. 274-289, 297.) Further, as to the convention which gave rise to the 1879 Constitution, there is no indication of an intent to provide for personal injury damages as a result of the adoption of article I, sections 11 and 21 in: the majority report of the Committee on Preamble and Bill of Rights which proposed the two sections; the minority report which contained the same language in what later would become article I, sections 11 and 21; or in the debate concerning the foregoing constitutional provisions. (I Debates and Proceedings of the Constitutional Convention of the State of California [hereafter Debates] (Oct. 24, 29, 1878) pp. 178-180, 232-234; III Debates (Feb. 20, 28, 1879) pp. 1425-1426, 1491.) The same is true as to the nineteenth and thirty-third paragraphs of article IV, section 25 of the Constitution of 1879. (I Debates (Nov. 11, 18, 1878, pp. 362-365, 450; II Debates (Dec. 21, 1878) pp. 803-806; III Debates (Feb. 5, 21, Mar. 1, 1879) pp. 1270-1271, 1441, 1497.) Finally, none of the documents prepared for the Article I Committee of the Constitution Revision Commission prior to the 1974 adoption of Proposition 7 refer to a right to sue for personal injury damages in the event of an equal protection violation. (Background Study for Article I Committee, Constitution Revision Commission (Aug. 1969) p. 16.) Our review of all available committee reports and debates since 1849 fails to reflect any intention on the part of the drafters of the

Our conclusion in this regard is consistent with the decisions in *Clausing* v. *San Francisco Unified School Dist.* (1990) 221 Cal.App.3d 1224, 1234-1238 [271 Cal.Rptr. 72] and *Leger* v. *Stockton Unified School Dist.* (1988) 202 Cal.App.3d 1448, 1454-1457 [249 Cal.Rptr. 688]. In those cases, different Courts of Appeal held that the provisions of article I, section 28, subdivision (a) which provided for safe schools did not give rise to a right to a monetary damages.[15] Citing the absence of legislative history on the part of the voters to create a right of private action or any language in the constitutional provision itself to that effect, the *Leger* and *Clausing* courts refused to permit a suit for damages premised upon article I, section 28, subdivision (a). In the present case, the language of article I, section 7 does not directly or indirectly mention the right to personal injury damages. Further, as in *Leger* or *Clausing*, there is no indication in the voter pamphlet that such a right exists. As a result, as in *Leger* and *Clausing*, there is no right to compensation under article I, section 7, subdivision (a) of the state Constitution in the present case.[16] For the foregoing reasons, we conclude the demurrer should have been sustained without leave to amend as to the equal protection claims of plaintiffs.[17]

---

1849, 1879, and present Constitutions to create a right to seek personal injury damages in the case of an equal protection violation.

[15]The pertinent provisions of article I, section 28, subdivision (a) stated: "The People of the State of California find and declare that the enactment of comprehensive provisions and laws ensuring a bill of rights for victims of crime, including safeguards in the criminal justice system to fully protect those rights, is a matter of grave statewide concern. [¶] The rights of victims pervade the criminal justice system, encompassing not only the right of restitution from the wrongdoers for financial losses suffered as a result of criminal acts, but also the more basic expectation that persons who commit felonious acts causing injury to innocent victims will be appropriately detained in custody, tried by the courts, and sufficiently punished so that the public safety is protected and encouraged as a goal of highest importance. [¶] Such public safety extends to public primary, elementary, junior high, and senior high school campuses, where students and staff have the right to be safe and secure in their persons."

[16]Other Courts of Appeal have argued that several constitutional provisions provide a right to damages other than in the eminent domain and privacy contexts. (*Fenton* v. *Groveland Community Services Dist.* (1982) 135 Cal.App.3d 797, 804 [185 Cal.Rptr. 758] [right to vote]; *Laguna Publishing Co.* v. *Golden Rain Foundation* (1982) 131 Cal.App.3d 816, 851-853 [182 Cal.Rptr. 813] [free speech and press].) This authority is not premised upon the question of the voters' intent—the critical analysis as defined by our Supreme Court in interpreting the California Constitution. (*Delaney* v. *Superior Court, supra,* 50 Cal.3d at p. 798.) Finally, we agree with the analysis in *Leger* v. *Stockton Unified School Dist., supra,* 202 Cal.App.3d at pages 1456-1457 as to why *Fenton* and *Laguna Publishing Co.* are not controlling authority.

[17]Other state's courts, for different reasons, have refused to hold that their state constitutional equal protection provisions provide a right to sue for damages. (*Rockhouse Mountain Prop.* v. *Town of Conway N.H.* (1986) 127 N.H. 593 [503 A.2d 1385, 1388-1390]; *King* v. *Alaska State Housing Authority* (Alaska 1981) 633 P.2d 256, 258-261; cf. *Kelley Property Dev.* v. *Town of Lebanon* (1993) 226 Conn. 314 [627 A.2d 909, 922] [due process]; *Figueroa* v. *State* (1980) 61 Hawaii 369 [604 P.2d 1198, 1205-1207] [due process].)

## IV. DISPOSITION

The petition for writ of mandate is granted. The respondent court is directed to set aside its order of March 14, 1994, overruling the demurrers as to the fifth and sixth causes of action and to enter a new order sustaining the demurrers to the fifth and sixth causes of action of all three first amended complaints without leave to amend. All parties are to bear their own costs in connection with these extraordinary writ proceedings.

Armstrong, J., concurred.

**GRIGNON, J.,** Dissenting.—When one reads the briefs of the parties in this case, one is immediately struck by the impression that the parties are not litigating the same case. The parties characterize the factual allegations of the complaint in disparate fashion. Clearly, the characterization controls the outcome.

Defendants characterize this case as a simple failure to provide police protection during the course of a riot, which allegedly resulted in injuries to plaintiffs. Defendants assert that they owe no duty to plaintiffs because of the absence of a "special relationship." Defendants further assert they are statutorily immune from liability under the applicable governmental immunity statutes. The majority adopts defendants' characterization of the complaint's factual allegations.

Plaintiffs characterize this case as an intentional violation of their state constitutional and statutory civil rights to be free from racial and ethnic discrimination. Plaintiffs assert that a duty to refrain from racial and ethnic discrimination arises out of the state Constitution and state civil rights acts. Plaintiffs further assert public entities and employees are not immune from liability for such intentional racial and ethnic discrimination. In my view, this is the correct characterization of the complaint's factual allegations.

This litigation is at the pleading stage; in ruling on a demurrer, the allegations of the complaint are deemed to be true, whatever the true facts may be. Although ultimately this case may factually be determined to be a simple failure to provide police protection, it is pleaded as a case of intentional racial and ethnic discrimination. Defendants owe a duty to plaintiffs to refrain from racial and ethnic discrimination and are not immune from liability for such discrimination. Therefore, the trial court properly overruled defendants' demurrer to the fifth and sixth causes of action of the complaints.

*Allegations of the Complaints*

The fifth causes of action are entitled, "Violation of Civil Rights [Civil Code section 51.7]." They allege: defendants "deprived plaintiff[s] of equal

protection of the laws by withdrawing protective services and failing to deploy and redeploy police officers in the aforementioned minority communities with the discriminatory intent to deny citizens residing and present in minority communities municipal services while simultaneously aggressively deploying police resources in communities inhabited by predominately Anglo [c]itizens. All defendants thereby deprived individuals residing and present in minority neighborhoods of the right to be free from violence in a manner which bore no rational relation to a legitimate state purpose, and acted with deliberate indifference and reckless disregard for the rights and safety of such citizens and individuals present and travelling through minority communities at all times mentioned herein, entitling plaintiff[s] to damages pursuant to Section 51.7 of the California Civil Code." Defendants, by their acts, "intentionally increased plaintiff[s'] vulnerability [] to acts of violence, and thereby deprived plaintiff[s] of the right to be free from violence in violation of California Civil Code section 51.7[, subdivision] (a), entitling plaintiff[s] to damages."

The sixth causes of action are entitled, "Violation of Civil Rights [Civil Code section 52]." They allege: Defendants "conspired to violate the plaintiffs' civil rights, by agreeing to and in fact creating and implementing, the policies and conduct as hereinabove alleged. The above mentioned defendants agreed, through their actions and/or inactions and acquiescence, to use their power and position to violate the plaintiffs' civil rights by purposely engaging in a policy of discrimination in the distribution of protective services. Defendants[,] and each of them, furthered the conspiracy in such a fashion that the conspiracy became an informal and/or formal decision, practice, or policy of the municipal defendants sued herein. Said actions as alleged above were undertaken by each of the individual named defendants in their capacities as final decision-makers pursuant to authority granted to them by the defendant City of Los Angeles and such actions represented official municipal policy and practice, entitling plaintiff[s] to damages pursuant to Section 52[, subdivision] (b) of the California Civil Code."

*Demurrer*

Defendants demurred to the fifth and sixth causes of actions of the complaints on the grounds of absence of duty and immunity from liability under Government Code sections 821, 845 and 846. Defendants argued the police have no duty to protect a victim from the criminal acts of a third party in the absence of a "special relationship" and no "special relationship" had been alleged. Defendants also argued that, as public entities and employees, they are immune from liability for failure to provide police protection or sufficient police protection (Gov. Code, § 845), for failure to make an arrest

(Gov. Code, § 846) and for adopting, failing to adopt or failing to enforce an enactment (Gov. Code, § 821).

Plaintiffs responded that they alleged a duty under Civil Code sections 51.7 and 52 and statutory governmental immunities are inapplicable to civil rights claims. In this court, plaintiffs have expanded their contentions. They assert they have also alleged a duty under the equal protection clause of the state Constitution.

*Duty*

Before reaching the issue of governmental immunity, it must first be determined whether a public entity or employee owes a duty to a plaintiff. "Conceptually, the question of the applicability of a statutory immunity does not even arise until it is determined that a defendant otherwise owes a duty of care to the plaintiff and thus would be liable in the absence of such immunity." (*Davidson* v. *City of Westminster* (1982) 32 Cal.3d 197, 201-202 [185 Cal.Rptr. 252, 649 P.2d 894].) In California, a public entity is not liable for any claim against it except as provided by statute or required by the state or federal Constitution. (Gov. Code, § 815; *Cochran* v. *Herzog Engraving Co.* (1984) 155 Cal.App.3d 405, 409 [205 Cal.Rptr. 1]; *Lundeen Coatings Corp.* v. *Department of Water & Power* (1991) 232 Cal.App.3d 816, 832 [283 Cal.Rptr. 551].) A public entity is liable for injury caused by acts or omissions of its employees in the course and scope of employment. (Gov. Code, § 815.2.) Public employees are liable for injuries caused by their acts or omissions to the same extent as private persons. (Gov. Code, § 820.) "Thus, 'the general rule is that an employee of a public entity is liable for his torts to the same extent as a private person [citation] and the public entity is vicariously liable for any injury which its employee causes [citation] to the same extent as a private employer [citation].'" (*Leger* v. *Stockton Unified School Dist.* (1988) 202 Cal.App.3d 1448, 1461 [249 Cal.Rptr. 688].)

Government Code section 815 provides that a public entity is not liable for injuries except as provided by statute. The phrase "as provided by statute" is to be given its broadest possible meaning. (*Levine* v. *City of Los Angeles* (1977) 68 Cal.App.3d 481, 487 [137 Cal.Rptr. 512].) "It is not interpreted to mean that public entities are liable in tort only when the Legislature has enacted a statute imposing liability which on its face is applicable to public bodies. Rather, a liability is deemed 'provided by statute' if a statute defines the tort in general terms." (*Ibid.* [Civ. Code, § 1714]; accord, *Lopez* v. *Southern Cal. Rapid Transit Dist.* (1985) 40 Cal.3d 780, 785, fn. 2 [221 Cal.Rptr. 840, 710 P.2d 907] [Civ. Code, § 2100]; *Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 933-937 [101 Cal.Rptr.

568, 496 P.2d 480].) Civil Code sections 51.7 and 52 define a tort in general terms. Accordingly, in the absence of an immunity, a public entity and its employees are liable for violations of Civil Code sections 51.7 and 52.

In addition, the state Constitution may provide a cause of action against a public entity independent of any statute providing for liability. (*Fenton* v. *Groveland Community Services Dist.* (1982) 135 Cal.App.3d 797, 804 [185 Cal.Rptr. 758].) A constitutional right contained in a self-executing provision of the state Constitution supports a cause of action for damages. (*Ibid.*) Article I, section 7 of the state Constitution provides: "A person may not be deprived of life, liberty, or property without due process of law or denied equal protection of the laws . . . ." This provision is presumed to be self-executing. (135 Cal.App.3d at p. 805 [constitutional right to vote]; *Laguna Publishing Co.* v. *Golden Rain Foundation* (1982) 131 Cal.App.3d 816, 851-853 [182 Cal.Rptr. 813] [constitutional rights to free speech and press]; *Porten* v. *University of San Francisco* (1976) 64 Cal.App.3d 825, 829-832 [134 Cal.Rptr. 839] [constitutional right to privacy]; cf. *Clausing* v. *San Francisco Unified School Dist.* (1990) 221 Cal.App.3d 1224, 1237 [271 Cal.Rptr. 72] [constitutional right to safe schools]; *Leger* v. *Stockton Unified School Dist., supra,* 202 Cal.App.3d at pp. 1453-1457 [same].) Government Code section 815 is not a bar to a cause of action for violation of a self-executing state constitutional right. (*Fenton* v. *Groveland Community Services Dist., supra,* 135 Cal.App.3d at pp. 804-805.)

From the foregoing, it is apparent that, in the absence of immunity, public entities and employees may be liable for violations of a plaintiff's state constitutional right to equal protection and for violations of Civil Code sections 51.7 and 52. In this case, plaintiffs have sufficiently pleaded violations of these duties by defendants. Although plaintiffs have titled their causes of action statutory violations of Civil Code sections 51.7 and 52, they expressly allege deprivations of their right to equal protection of the laws, a state constitutional right. "Whether plaintiff can prove these allegations, or whether it will be difficult to prove them, are not appropriate questions for a reviewing court when ruling on a demurrer." (*Leger* v. *Stockton Unified School Dist., supra,* 202 Cal.App.3d at p. 1460.)

*Immunity*

Once it has been determined a public entity and its employees owe a duty to a plaintiff, it must next be determined whether the public entity and its employees are immune from liability. The existence of a duty does not

overcome an immunity barrier to liability; the two concepts must be separately analyzed. (*Davidson* v. *City of Westminster, supra*, 32 Cal.3d at p. 202.) " '[I]n governmental tort cases "the rule is liability, immunity is the exception" . . . .' " (*Lopez* v. *Southern Cal. Rapid Transit Dist., supra*, 40 Cal.3d at pp. 792-793.)

In this case, defendants assert they are immune from liability under Government Code section 845. Government Code section 845 provides: "Neither a public entity nor a public employee is liable for failure to establish a police department or otherwise to provide police protection service or, if police protection service is provided, for failure to provide sufficient police protection service." Government Code "section 845 was designed to protect from judicial review in tort litigation the political and budgetary decisions of policymakers, who must determine whether to provide police officers or their functional equivalents." (*Leger* v. *Stockton Unified School Dist., supra*, 202 Cal.App.3d at p. 1463; *Peterson* v. *San Francisco Community College Dist.* (1984) 36 Cal.3d 799, 815 [205 Cal.Rptr. 842, 685 P.2d 1193]; *Carpenter* v. *City of Los Angeles* (1991) 230 Cal.App.3d 923, 934-935 [281 Cal.Rptr. 500].)

Immunity statutes have wide, but not universal, applicability. Governmental immunity statutes may not be applicable when they conflict with other state statutory provisions. (*Duarte* v. *City of San Jose* (1980) 100 Cal.App.3d 648, 656 [161 Cal.Rptr. 140].) Where a governmental immunity conflicts with a liability imposed by a statute outside the Government Tort Claims Act (Gov. Code, § 810 et seq.), we must determine whether the liabilities imposed by the statute "serve a purpose that is frustrated by an immunity . . . ." (*Duarte* v. *City of San Jose, supra*, 100 Cal.App.3d at p. 656.) "If so, . . . the statutory liabilities must prevail." (*Ibid.*; *Shoemaker* v. *Myers* (1992) 2 Cal.App.4th 1407, 1424-1425 [4 Cal.Rptr.2d 203]; cf. *Mikkelsen* v. *State of California* (1976) 59 Cal.App.3d 621, 629-630 [130 Cal.Rptr. 780]; *O'Hagan* v. *Board of Zoning Adjustment* (1974) 38 Cal.App.3d 722, 728-732 [113 Cal.Rptr. 501].) In addition, governmental immunities do not defeat invasions of constitutional rights. (*Young* v. *County of Marin* (1987) 195 Cal.App.3d 863, 869-870, fn. 3 [241 Cal.Rptr. 169]; cf. *Urbaniak* v. *Newton* (1991) 226 Cal.App.3d 1128, 1141 [277 Cal.Rptr. 354]; *Rancho La Costa, Inc.* v. *Superior Court* (1980) 106 Cal.App.3d 646, 667 [165 Cal.Rptr. 347]; see *Heller* v. *Norcal Mutual Ins. Co.* (1994) 8 Cal.4th 30, 44 [32 Cal.Rptr.2d 200, 876 P.2d 999] [issue not reached].) For example, a public entity's liability for acts of its public employees in the course of their employment

motivated by and resulting in racial discrimination is not barred by governmental immunity. (*Watson* v. *Department of Rehabilitation* (1989) 212 Cal.App.3d 1271, 1285 [261 Cal.Rptr. 204]; see *Stone* v. *State of California* (1980) 106 Cal.App.3d 924, 930, fn. 8 [165 Cal.Rptr. 339].)[1]

There can be no real question of the inapplicability of the police protection governmental immunity to violations of the state constitutional right to equal protection by a public entity and its employees. The state constitutional right to equal protection is self-executing, permitting a cause of action for damages, and state immunity statutes cannot defeat the liability of a public entity for violations of state constitutional rights.

The question of whether the police protection governmental immunity defeats causes of action based on statutory violations of Civil Code sections 51.7 and 52 is more difficult. I believe, however, the question must be answered in the negative. It is beyond dispute that public entities and employees are immune from suit for personal injuries or property damage incurred by third persons in the course of a riot. (*Susman* v. *City of Los Angeles* (1969) 269 Cal.App.2d 803 [75 Cal.Rptr. 240].) Public entities and employees are not liable whether they provide too little police protection or too much. (*Ibid.*; *Wong* v. *City of Miami* (Fla. 1970) 237 So.2d 132, 134.) That is not, however, the question presented in this case. The question presented in this case is whether public entities and employees are immune from suit for personal injuries or property damage incurred by third persons as a result of decisions to withhold police protection on the basis of race or ethnicity.

Civil Code section 51.7 states that all individuals in the state have the right to be free from race- or ethnicity-related violence. Civil Code section 52 provides an action for damages and civil penalties against persons who deny an individual his or her right to be free from such violence. These statutory civil rights provisions serve very important public purposes reflecting established constitutional policies, which would be frustrated by the application of a general governmental immunity statute. Police officers who deliberately fail to assist victims of violent crime on the basis of race or ethnicity cannot be immune from suit. Nor can a public entity be immune from suit if it intentionally deploys police personnel in a manner motivated

---

[1]California governmental immunity statutes also are not applicable to federal causes of action, such as violations of the Voting Rights Act (42 U.S.C. § 1971 et seq.) and the Civil Rights Act (42 U.S.C. § 1981 et seq.). (*Fenton* v. *Groveland Community Services Dist., supra,* 135 Cal.App.3d at pp. 807-808; cf. *Rossiter* v. *Benoit* (1979) 88 Cal.App.3d 706, 712-714 [152 Cal.Rptr. 65].)

by and resulting in racial or ethnic discrimination. No legitimate governmental interest is served by application of the police protection immunity under these circumstances.

I would deny the petition for a writ of mandate.

A petition for a rehearing was denied March 6, 1995, and the petition of real parties in interest for review by the Supreme Court was denied May 18, 1995. Mosk, J., and Kennard J., were of the opinion that the petition should be granted.